# United States Court of Appeals
## For the First Circuit

No. 02-1501

UNITED STATES,

Appellant,

v.

STANISLAW GOLAB, A/K/A STANISLAW GALAB,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Paul J. Barbadoro, <u>U.S. District Judge</u>]

Before

Lynch, <u>Circuit Judge</u>,
Cyr, <u>Senior Circuit Judge</u>,
and Stahl, <u>Senior Circuit Judge</u>.

<u>Mark S. Zuckerman</u>, Assistant United States Attorney, with whom <u>Thomas P. Colantuono</u>, United States Attorney, was on brief, for appellant.
<u>J. Normand Jacques</u>, with whom <u>Jacques & Jacques, P.C.</u>, was on brief, for appellee.

April 7, 2003

**STAHL**, **Senior Circuit Judge**.  The United States appeals from a district court order allowing defendant-appellee Stanislaw Golab's motion to suppress evidence seized from his car.  We affirm.

## I.  BACKGROUND

The following facts are undisputed.  On July 6, 2001, Golab's car was searched by Immigration and Naturalization Service Special Agent Mark Furtado.  Furtado was a fourteen-year veteran of the INS's law enforcement branch and was the Supervisory Special Agent in charge of the INS field office in Manchester, New Hampshire.

Based on his experience, Furtado was aware that one form of alien smuggling involved out-of-state residents transporting aliens to Social Security Administration ("SSA") offices in New Hampshire to help them fraudulently obtain Social Security cards.  In March, 1999, his office had made several arrests in connection with a smuggling scheme that involved the use of a van with New Jersey license plates bringing aliens from the New York City area to New Hampshire SSA offices.

On July 2, 2001, Furtado learned that within the past two weeks, an alien had applied for a Social Security card using a counterfeit visa at the SSA office in Manchester, New Hampshire. On the application form, the applicant listed as a mailing address a New Hampshire Mail Boxes, Etc. facility.  Furtado knew from

experience that aliens making fraudulent applications typically listed businesses such as Mail Boxes, Etc., as their addresses.

On the morning of July 6, 2001, the manager of the Concord, New Hampshire SSA office called Furtado and told him that an individual named Zenon Kulesza was in the office and had applied for a Social Security card using a non-immigrant I-visa. Furtado checked INS records and learned that Kulesza had entered the United States as a non-immigrant visitor for pleasure, an indication that the I-visa and application were fraudulent.

Furtado immediately drove to the Concord SSA office with INS Deportation Officer Joseph Anoli. After they arrived, Anoli confirmed by telephone that Kulesza was still at the office. Furtado, believing that Kulesza would have an accomplice, drove around the Concord SSA office parking lot looking for an occupied car with out-of-state license plates.[1] Furtado was driving an unmarked white Ford Crown Victoria equipped with a radio antenna and a cell phone antenna.

There were approximately twenty-five to thirty cars in the Concord office parking lot, but none of them were occupied. Furtado testified that he did notice an occupied car in a nearby lot, however. This lot was located adjacent to a commercial office building; it was separated from the Concord SSA office lot by a

_____

[1]At this time, neither agent entered the office to question or arrest Kulesza; nor did they wait to observe Kulesza's departure from the office to see if he approached an accomplice.

grassy area, but accessible via a driveway approximately one hundred yards long. A road led from this lot directly to the public street, Horseshoe Pond Road.

As Furtado drove down the access road to approach the occupied car, it pulled out of its parking space. The car turned down the access road, heading directly toward Furtado's approaching vehicle. Furtado saw that the car had a Vermont license plate. Suspecting that the driver was Kulesza's out-of-state accomplice and was trying to leave the area, Furtado stopped the car by meeting it nose-to-nose with his own vehicle. He directed the driver to back up into a parking space.

Furtado and Anoli approached the car and took the keys. Furtado saw a woman lying on the back seat. After determining that she was an undocumented foreign national without authorization to be in the United States, he arrested her. He searched the back seat of the car, finding little. After the driver was unable to provide a passport, the officers arrested him for being an undocumented alien. A second search of the car yielded a passport with what Furtado suspected was a counterfeit visa.

On August 22, 2001, Golab, the car's driver, was indicted by a federal grand jury on three counts of bringing in and harboring aliens under 8 U.S.C. § 1324(a)(1)(A)(iv) and three counts of fraud and misuse of visas under 18 U.S.C. § 1546(a). On March 8, 2002, Golab filed a motion to suppress the evidence seized

from his car on the ground that the search resulted from an illegal stop. On April 18, 2002, the district court held an evidentiary hearing. It ruled from the bench that the stop of Golab's car was not supported by reasonable suspicion and allowed the motion to suppress. The government appeals.

## II. DISCUSSION

Our review of the district court's allowance of the motion to suppress, including its determination that the officer lacked reasonable suspicion, is plenary. Ornelas v. United States, 517 U.S. 690, 699 (1996). We review findings of historical fact for clear error, and give "due weight to inferences drawn from those facts by resident judges and local law enforcement officers." Id.

In Terry v. Ohio, 392 U.S. 1, 30 (1968), the Supreme Court held that the Fourth Amendment permits an officer to conduct a brief investigatory stop on the basis of a reasonable, articulable suspicion that criminal activity is afoot. While "reasonable suspicion" is a less demanding standard than probable cause, the Fourth Amendment requires at least a minimal level of objective justification for making the stop. United States v. Sokolow, 490 U.S. 1, 7 (1989). The officer must be able to articulate more than an "inchoate and unparticularized suspicion or 'hunch'" of criminal activity. Terry, 392 U.S. at 27. In reviewing a determination of reasonable suspicion, we examine the

"totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing. United States v. Arvizu, 534 U.S. 266, 273 (2002).

Applying these standards, we agree with the district court that there was no objectively reasonable suspicion to justify a Terry stop of the car in light of the totality of the circumstances. The basis for the stop amounted to no more than an impermissible hunch. Terry, 392 U.S. at 27.

First, the car was not in the SSA office parking lot, which contained a number of vehicles as well as many empty spaces. Rather, it was in a different lot associated with a commercial office building, separated by a grassy area and a lengthy access road. Also, a very short time elapsed between when Furtado first saw the car and when he stopped it, somewhere between fifteen seconds and a minute. This was not enough time, the government conceded, to discern whether the driver was sitting and waiting in the car, or had just gotten in the car to leave.

Further, the car's license plates were from Vermont. Such plates, the district court found, are a common sight in Concord, New Hampshire and by themselves raise no suspicion. Moreover, the earlier alien smuggling with which Furtado was familiar involved individuals driving to New Hampshire in vans, not cars, from the New York City area. Furtado testified that the

Vermont plate had no "special significance" to him with regard to the earlier smuggling rings. It is objectively unreasonable to say that this prior smuggling ring justified the suspicion of all vehicles with out-of-state plates, regardless of their origin.

In a similar vein, the district court noted that the Vermont plate was inconsistent with Furtado's stated theory concerning why the earlier smugglers traveled to New Hampshire, which was that more rural SSA offices in areas with smaller immigrant populations are easier to defraud than those in the New York City area. Furtado conceded in his testimony that he believed the number of immigrants in Vermont was comparable to that in New Hampshire. Hence, from his perspective, there would be no need to travel from Vermont to New Hampshire to find a presumably unsophisticated SSA office.

Under these circumstances, reasonable suspicion is not established by the fact that a car in a remote parking lot associated with another building has out-of-state license plates and is occupied. Based on that rationale, no person would be protected from a <u>Terry</u> stop.

The government additionally maintains that the driver aroused reasonable suspicion by attempting to flee what he recognized to be a law enforcement vehicle. As the district court found, there is no record support for this assertion. The court indicated that it had personally taken a view of the premises.

Based on its view of the physical configuration of the two buildings, parking lots and roads, the court rejected the inference urged by the government that the driver could have seen the agents' car pass by at thirty miles per hour on Horseshoe Pond Road, some 150 yards away, and noticed the radio antenna. Moreover, the layout of the buildings would have prevented the driver from seeing the agents' car enter the SSA parking lot. Accordingly, the court concluded that it was highly unlikely that the driver could have recognized the agents' unmarked car as a law enforcement vehicle and believed that government agents were in pursuit.

Moreover, the court observed, if the driver was trying to elude the agents, it is far more plausible that he simply would have exited straight out of the parking lot onto the public street; instead, he made a sharp turn to head directly toward the agents' vehicle.[2] Finally, the government conceded that nothing in the driver's movements or facial expressions suggested that he was fleeing. We defer to the district court's findings and inferences and agree that the driver's behavior does not, alone or in conjunction with the rest of the factual circumstances, support a determination of reasonable suspicion.[3]

_____

[2]At the hearing, Furtado did not dispute the court's assessment.

[3]In the absence of indicia that the driver was fleeing law enforcement, his departure should indeed have reduced Furtado's suspicion that he was Kulesza's accomplice, since Kulesza was still in the building and presumably dependent on his accomplice for

The government contends that while the driver's actions may have seemed perfectly innocuous to the average observer, Agent Furtado's training and experience made him aware of indicia of alien smuggling that supported reasonable suspicion. It is true that deference is due to the experienced perceptions of law enforcement officers. Arvizu, 534 U.S. at 273; Ornelas, 517 U.S. at 699-700. But blind deference is not owed. The officer's perceptions must be objectively reasonable, and here they were not.

The situation observed by Furtado -- an individual leaving a parking lot near the SSA office in a car with Vermont plates -- did not sufficiently resemble the earlier smuggling scheme to justify his Terry stop of the car. Considering the totality of the circumstances, Agent Furtado's suspicion was no more than a "inchoate and unparticularized suspicion or 'hunch'" of criminal activity. See Terry, 392 U.S. at 27. Accordingly, it was insufficient to warrant Fourth Amendment protection.

The district court's allowance of Golab's motion to suppress is **AFFIRMED**.

---

transportation.