# United States Court of Appeals

## For the First Circuit

No. 03-1765

JEAN ISOM, as a beneficiary, best friend, mother, natural
guardian and representative of the estate of ROBERT MARK ISOM,
and in her individual capacity,
Plaintiff, Appellant,

v.

TOWN OF WARREN, RHODE ISLAND, POLICE CHIEF THOMAS B. PERROTTO,
JR., POLICE OFFICER SAM GREEN, POLICE OFFICER RAYMOND J.
OUELLETTE, POLICE DETECTIVE MICHAEL PATRICK CLANCY,
POLICE CAPTAIN ELY BARKETT, POLICE OFFICER JOSEPH R. LOISELLE,
Defendants, Appellees,

DR. ELIZABETH LAPOSTA, RHODE ISLAND MEDICAL EXAMINER,
KEVIN HOPKINS, DETECTIVE,
Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary M. Lisi, U.S. District Judge]

Before

Lynch, Circuit Judge,
Stahl, Senior Circuit Judge,
and Lipez, Circuit Judge.

Edward P. Manning, Jr. for appellant.
Anthony F. DeMarco, with whom Reynolds, DeMarco & Boland, Ltd.
was on brief, for appellees.

February 25, 2004

**LYNCH**, **Circuit Judge**.  This case arises out of an incident that was tragic for everyone involved.  A few moments after saying he wanted to die, Robert Mark Isom, age 33 and emotionally disturbed, was shot to death by police officers of the Town of Warren, Rhode Island on the morning of March 7, 1997.  Isom had entered a liquor store with an axe and briefly held hostage two employees before releasing one and inadvertently allowing the other to escape.  When officers entered the store, Isom ignored their continuous requests to put down the axe; fearing for the officers' safety, one officer attempted to subdue Isom with pepper spray.  Isom responded not by dropping to the ground, as the officer had hoped, but by raising the axe and running toward two officers.  Those officers then shot Isom to death.

His mother, Jean Isom, sued the town, its police chief, several officers, and the medical examiner in federal district court, asserting claims of excessive use of force under 42 U.S.C. § 1983 and state law claims for wrongful death under R.I. Gen. Laws § 10-7-1.  At the heart of the case is the claim that the decision to use the pepper spray was a colossal misjudgment, resulting in a needless and wrongful death.

Although the defendants moved for summary judgment on the basis of qualified immunity, for reasons not apparent on the record, the district court never decided the motion.  Rather, the

case went to trial on April 21, 2003, and the jury heard three days of evidence.

At the close of the plaintiff's case, the defendants made a motion for judgment as a matter of law under Fed. R. Civ. P. 50(a). The court orally granted the motion and subsequently wrote a decision explaining its reasoning. We affirm.

Many excessive force cases involving officers' judgment calls are resolved on qualified immunity grounds, either on summary judgment or at trial. See Ryder v. United States, 515 U.S. 177, 185 (1995) ("Qualified immunity specially protects public officials from the specter of damages liability for judgment calls made in a legally uncertain environment."). But the defendants did not raise immunity as an issue at the time of their Rule 50 motion, and so they have waived that defense as a grounds for the motion.

**I.**

Our review of the grant of the Rule 50(a) motion is de novo. Espada v. Lugo, 312 F.3d 1, 2 (1st Cir. 2002). We review the evidence, taking all inferences in favor of Isom, and ask whether a reasonable jury could have decided that the defendants were liable based on the evidence presented. See Acevedo-Garcia v. Monroig, No. 02-1139, 2003 U.S. App. LEXIS 24475, at *40 (1st Cir. Dec. 5, 2003); Transamerica Premiere Ins. Co. v. Ober, 107 F.3d 925, 929 (1st Cir. 1997).

**II.**

We describe the evidence adduced at trial in the light most favorable to the plaintiff.

On the morning of March 7, 1997, Robert Mark Isom entered 1776 Liquors, a liquor store in Warren, Rhode Island. Erin Alves and Beth Engell were working at the store, but no customers were present. After walking around the store, Isom approached Alves and asked her if she was single and would like to go on a date. Alves explained that she had a boyfriend, and asked if she could help Isom find anything. Isom did not respond, but simply left the store.

Alves watched Isom through the store window as he opened the trunk of a car and removed an object wrapped in newspaper. Isom came back into the store with the concealed item and placed it on the store counter. He asked Engell to lock the store's doors, but she said that she did not have the keys. Alves recalled that Isom "was saying his life was worth shit and he had nothing to live for." Isom then asked Alves and Engell if they had a gun; they responded that they did not. Continuing to mutter that his life was worthless, Isom pressed the concealed item against Engell's stomach, explaining that he did not want to have to hurt either Alves or Engell. At some point, Alves activated a silent alarm behind the counter.

Isom then unwrapped the concealed item -- it was an axe. He began to play with the axe. Alves started to cry and Engell

asked Isom if Alves could leave because she was pregnant.  Isom said yes, and Alves left the store.  Shortly thereafter, when Isom put his head down on the counter and continued to mutter, Engell ran out of the store as well.

Engell encountered Police Sergeant Green, who asked her whether the man inside was armed (the silent alarm had brought the police to the store).  Engell replied that Isom was carrying an axe.  Green, by himself, entered the store with his gun drawn and started talking to Isom, who was standing in the middle of the store.  Isom was initially silent, but eventually told the officer his name and said, according to Green, that "he was going to die today."  Isom then became non-responsive to Sergeant Green's further questions and "just went blank."  He was holding the axe in his right hand with a tight grip, and it was raised slightly up.  Several seconds later, Officer Ouellette, who had arrived separately, entered the store and knelt down, with his gun drawn, on Sergeant Green's right.  At about the same time, another officer, Loiselle, entered the store and positioned himself at the rear exit.

Green and Ouellette testified that they started "continuously" "pleading" for Isom to drop the axe, but Isom remained in a daze and did not reply. At some point, two other officers, Captain Barkett and Detective Clancy, entered the store. Sergeant Green explained to Captain Barkett that he was "trying to

handle it between [himself] and Mr. Isom." Captain Barkett did not reply. Detective Clancy also began telling Isom to drop the axe.

After several minutes, Detective Clancy, who was in plain clothes, reached over and removed Sergeant Green's cannister of pepper spray from his belt. He testified that he was concerned that, given Isom's non-responsiveness, the officers' safety was in danger and he believed that spraying Isom with the pepper spray would allow the officers to suppress Isom. Detective Clancy then held up the pepper spray to Captain Barkett, the commanding officer on the scene, who "nodded to [Clancy] in the affirmative nature." Detective Clancy yelled out "ASR," an indication to the other officers that he was going to use the spray; each of the officers had been through several hours of training on the use of pepper spray in which this code-word had been explained.

From behind the store counter, Detective Clancy started to spray Isom with the pepper spray and yelled for Isom to put down the axe. Clancy explained that normally the spray "causes debilitation . . . and you just want to succumb to [officers'] commands." Still, the spray appeared to have no effect on Isom, which Clancy found "remarkable." Clancy testified that in "[a]ll of the years that [he had] used the spray, it's always had an [e]ffect on individuals." Officer Ouellette also said that he was "caught off guard" when the spray did not affect Isom. Officer Loiselle agreed, explaining that the spray did not seem to have an

effect on Isom, which was unusual: "[t]ypically an individual exposed to [the spray] would have an involuntary closure of the eyes, uncontrollable coughing, loss of coordination or stamina."

After the spray stopped, Isom turned toward Officer Loiselle and then suddenly lifted the axe and charged toward Sergeant Green and Officer Ouellette.  When Isom was within ten feet of Green and Ouellette, still running toward them with the axe raised, the two officers fired their guns at Isom.  Isom fell to the floor and died shortly thereafter.

**III**.

A.  Section 1983 Claim

Plaintiff's § 1983 claim alleges that the officers violated Isom's Fourth Amendment rights by using excessive force in the course of attempting to disarm him.  In order to prevail on this claim, the plaintiffs must establish that the officers' use of the pepper spray was objectively unreasonable under the circumstances.  See Graham v. Connor, 490 U.S. 386, 397 (1989); Jarrett v. Town of Yarmouth, 331 F.3d 140, 148 (1st Cir. 2003).

This inquiry requires the factfinder to consider the reasonableness of the officers' actions from the perspective of a reasonable officer on the scene, rather than through the lens of hindsight.  Graham, 490 U.S. at 396.  In doing so, the factfinder should take into account "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the

officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." <u>Id.</u> at 396; <u>Bastien</u> v. <u>Goddard</u>, 279 F.3d 10, 14 (1st Cir. 2002). All of the attendant circumstances must be considered. <u>See</u> <u>Graham</u>, 490 U.S. at 396.

The police here encountered a situation fraught with hazard for themselves and for Isom; Isom was a distraught, seemingly suicidal man, who had briefly held two hostages and was refusing to comply with continuous officer requests that he put down an axe. In the presence of such danger, the plaintiffs could not prevail at trial without providing some evidence that would bring into question the officers' judgment call to use pepper spray.

But the plaintiff presented no evidence directly addressing this point. The closest that the plaintiff came was in the testimony of Sergeant Green:

> Q. And I believe you indicated that you would not have used the pepper spray at that time on Mark Isom?
> A. Yes, sir, I did.
> Q. And what did you give for your reason for that?
> A. It wouldn't -- I don't think it would be effective at that point. He still had an axe in his hand, so it wouldn't be an option for me.
> ...
> Q. Why would you have not, according to your testimony, have sprayed Mr. Isom at that time?
> A. It wasn't an option for me, like I said before. He had an axe and that by spraying him may not have helped the situation at all.

During cross-examination, Sergeant Green elaborated on his earlier testimony about the pepper spray:

-8-

Q. What did you feel your responsibility was in covering Mr. Isom with your firearm from the time you were in the store until the shots were actually fired? What was your responsibility other than trying to convince him to disarm?
A. To make sure that he wasn't going to go and hurt one of us or hurt himself and try to contain him inside of the building.
Q. And in order to do that job, was pepper spray an option for you?
A. No, sir.
Q. And can you tell me and the judge and the Court why pepper spray was never an option for you during that time you were in the store?
A. I feared for my life, and I feared that he was going to hurt one of us. And I was the primary officer on the scene, and I had to focus on what was happening at hand.
Q. You testified that there was no warning by Officer Clancy prior to the time he actually yelled ASR that he was going to use the pepper spray. Did you feel that pepper spray at that point in time was an option for Officer Clancy?
A. Yes.
       ...
Q. [W]hat did you expect Isom to do if he had been hit by the pepper spray?
A. Probably become disoriented where we could actually physically take him down.

(emphasis added). Sergeant Green's testimony was not, as plaintiff contends, that no objective police officer could have thought that the use of pepper spray was warranted in the circumstances faced by Detective Clancy. On the most favorable reading of the testimony for the plaintiff, Sergeant Green's testimony establishes only that he believed it would not have been reasonable for an officer in Green's particular situation to use the pepper spray. But, as Sergeant Green himself explained, the circumstances and responsibilities that he faced were quite different than those faced by Detective Clancy. As the initial officer on the scene,

-9-

Green's primary responsibility was not necessarily to defuse the situation so much as to prevent it from escalating. Detective Clancy, who arrived at the store after the other officers had established some control over the situation, was in a different situation from Green, and thus had different tactical options available to him in deciding what was the most appropriate action. In fact, Sergeant Green acknowledged that use of the pepper spray was "an option" for Detective Clancy.

Aside from Sergeant Green's testimony, the plaintiff did not present any other evidence even addressing the reasonableness of the officers' actions. No expert testified that, under the circumstances faced by Detective Clancy, no reasonable officer would have used pepper spray; in fact, the plaintiffs did not produce any expert testimony at all.[1] Nor did the plaintiff produce any written policy or text stating that the use of pepper spray in circumstances such as those faced by Clancy was not reasonable. The plaintiff argues that such evidence was not needed -- that this is a matter which should have been left to the jury's common sense and that the plaintiffs were entitled to let the jury reach a decision.

---

[1]Counsel for plaintiff apparently initially intended to present several expert witnesses, but the district court disallowed these witnesses in a pre-trial ruling. The basis for this ruling was plaintiff's counsel's repeated failure to provide expert disclosure statements pursuant to Fed. R. Civ. P. Rule 26. Plaintiff does not challenge that ruling on appeal.

We agree with the district court that this argument fails. For the jurors to have been given an opportunity to exercise their common sense on the ultimate question of whether no objectively reasonable officer would have used pepper spray, there must have been some basis in the evidence on which to ground that determination. Even putting aside the evidence that Detective Clancy was experienced in the use of pepper spray, believed it would decrease the ultimate risk of violence from Isom, and requested and received permission to use the spray from the commanding officer, no reasonable jury could have found in the plaintiff's favor. There was no evidence from which the jury could rationally draw the conclusion that the officers' actions were objectively unreasonable. At best, Sergeant Green said that <u>he</u> would not have used the pepper spray, not that an objectively reasonable officer in Detective Clancy's position would not have.

B. <u>Wrongful Death Claims</u>

The court also dismissed plaintiff's state law wrongful death claims. The Rhode Island statute requires that death be caused by the wrongful act, neglect, or default of another. <u>See</u> R.I. Gen. L. § 10-7-1. In theory, the plaintiff in this case might have established a breach of a duty of care by showing a violation of the Warren police department's use-of-force policy. That policy provides, in relevant part, that:

> 2. Non-deadly force may be used by a police officer in the performance of his duty:

　　　　a. when necessary to preserve the peace, prevent commission of offenses, or prevent suicide or self-infl[i]cted injury; or
　　　　b. when necessary to overcome resistance to arrests, to conduct searches and seizures, and to prevent escapes from custody; or
　　　　c. when in self-defense, or defense of another against unlawful violence to his person or property.
　　...
　　9.　Chemical substances may be used when physical force is necessary:
　　　　a. to protect an officer or other person from an assault; or
　　　　b. to SUBDUE a person who resists arrest; or
　　　　c. to deter persons engaged in riotous conduct.
　　It is preferred that chemical substances not be used if resistance is minor and not hazardous, or if physical powers would reasonably achieve the same end.

(emphasis in original).

　　　　No breach of a duty of care can be based on this policy. The policy gives officers significant discretion to exercise their judgment in using pepper spray; the officers were within that discretion when they decided to use pepper spray on Isom. To the extent that the state law claim is based on common law notions of duty of care, our conclusion that there was insufficient evidence to show that the officers acted in an objectively unreasonable fashion is sufficient to support dismissal.

**IV.**

　　　　Judgment for the defendants is **<u>affirmed</u>**.

-12-