John BLACKSTONE, Plaintiff,

v.

Norbert QUIRINO, et al., Defendants

No. CIV.03–126–B–K.

United States District Court,
D. Maine.

March 17, 2004.

Peter S. Kelley, Law Offices of Peter S. Kelley, Esq., Caribou, ME, Brett D. Baber, Law Office of Brett D. Baber, Bangor, ME, for John M Blackstone, Plaintiff.

Edward R. Benjamin, Jr., Thompson & Bowie, Portland, ME, for Norbert A Quirino, Paul Theriault, Mark Barnes, Defendants.

## MEMORANDUM OF DECISION ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [1]

KRAVCHUK, United States Magistrate Judge.

John Blackstone is pursuing a § 1983 claim against Norbert Quirino, Paul Theriault and Mark Barnes, three members of the Presque Isle Police Department,[2] contending that they subjected him to an unlawful seizure and an unlawful arrest in connection with a roadside stop on June 7, 2002. Supplemental to his federal claim, Blackstone is pursuing state law tort claims.[3] The defendants request an entry of summary judgment on all claims, arguing that no constitutional violations occurred and that they are entitled to qualified immunity under federal law and discretionary function immunity under the Maine Tort Claims Act, 14 M.R.S.A. §§ 8101–8118 ("MTCA"). I grant the motion in part.

### Facts [4]

On the evening of June 7, 2002, John Blackstone was driving himself and his minor daughter home in his green Chevrolet pickup truck. Earlier that evening, Blackstone had attended his older daughter's high school graduation and had gone out to eat with his wife. (Pl.'s Statement of Add'l Material Facts, Docket No. 13, "PSAMF," ¶ 1.) Blackstone does not drink alcohol and had not consumed any alcoholic beverages that evening. (*Id.*, ¶ 3.) At roughly 10:00 p.m. on June 7, 2002, Officers Norbert Quirino and Paul Theriault of the Presque Isle Police Department were on routine patrol in a police cruiser and were driving behind Blackstone's pickup truck. (Defs' Statement of Material Facts, Docket No. 12; Pl.'s Response to Defs' Statement of Material Facts, Docket No. 13, hereinafter jointly cited as "SMF," ¶¶ 1, 2, 17, 18.) They observed the truck drifting within its lane. (SMF, ¶ 19.) Officer Quirino activated a dashboard-mount-

1. Pursuant to 28 U.S.C. § 636(c), the parties have consented to have United States Magistrate Judge Margaret J. Kravchuk conduct all proceedings in this case, including trial, and to order entry of judgment.

2. The parties' papers do not indicate whether the individual defendants are still employed by the City.

3. The state law causes of action are not named in Blackstone's complaint, which merely offers the heading "Count I Maine Tort Claims Act," incorporates certain factual allegations by reference, and recites a plea for damages.

4. The factual statement recited herein is drawn from the parties' Local Rule 56 statements of material facts in accordance with the Local Rule. The factual statement construes the available evidence in the light most favorable to the non-movant, Blackstone, and resolves all reasonable inferences in his favor. *Thames Shipyard & Repair Co. v. United States*, 350 F.3d 247, 276 (1st Cir.2003).

ed video camera. (*Id.*, ¶ 21.) The video camera recorded the pickup truck's operation for approximately one minute. A VHS tape copy of the recording has been produced in connection with the defendant's motion for summary judgment. The tape clearly depicts the pickup truck weaving within its lane of travel and, on at least two occasions, straddling or crossing the center line. (*Id.*, ¶¶ 25–27, 30–31 & Exhibit 2.) Officer Quirino activated his blue lights and the pickup pulled over to a stop on the right hand side of the road approximately ten seconds later. (SMF, ¶¶ 33–34.) According to Blackstone, he pulled over as soon as he realized that the cruiser was behind him and activated its lights. (PSAMF, ¶ 5.) Blackstone did not use his directional signals to indicate that he was pulling to the right, but did activate his left turn signals after coming to a stop. (SMF, ¶ 35.) Officer Quirino approached the driver's side of the pickup truck and asked Blackstone for his license, registration and proof of insurance. (*Id.*, ¶ 36.) Blackstone responded, "Is there a problem?" (*Id.*, ¶ 37.) Officer Quirino reiterated his request for Blackstone's documents. (*Id.*, ¶ 40.) When asked by Officer Quirino, Blackstone denied drinking, indicating that he does not drink alcohol. (*Id.*; ¶ 41; PSAMF, ¶ 6.) Meanwhile, Officer Theriault had approached the passenger side of the vehicle, where Blackstone's young daughter was seated. (SMF, ¶¶ 42–43.) Officer Theriault shined his flashlight into the pickup's passenger compartment and observed as Blackstone looked in the glove compartment for the documents requested by Officer Quirino. (*Id.*, ¶¶ 44–45.) According to Officer Quirino, Blackstone's eyes appeared to be slightly glassy. (*Id.*, ¶ 47.) Also according to Officer Quirino, he saw an empty "Mike's Hard Lemonade" six-pack container folded up in the glove compartment. (*Id.*, ¶ 46.) However, there was no such container in the glove compartment. (*Id.*, ¶ 46.) Officer Theriault, who was in a better position to see into the glove compartment, did not see any such container and Blackstone's testimony, which must be credited at this juncture, is that there was no such container in his truck's glove compartment, although there was a similarly-colored Midas Muffler envelope. (PSAMF, ¶¶ 9, 14–16.) Still, Blackstone himself offers in evidence the fact that Officers Quirino and Theriault believed they smelled an odor of an alcoholic beverage emanating from the truck, though he explains that the officers must have been confused by the smell of flavorings and syrups on his daughter's ice cream shop uniform (*Id.*, ¶¶ 10, 11, 19, 22–23; *see also* SMF, ¶ 39; Aff. of Amber Blackstone, attached to Docket No. 15, ¶ 5.)

Officer Quirino requested that Blackstone exit the pickup and walk to the front of the cruiser parked behind it. (SMF, ¶ 49.) Blackstone willingly complied and did not have any difficulty exiting the truck or walking to the cruiser. (PSAMF, ¶¶ 18, 27.) Officer Theriault moved to a position from which he could observe Officer Quirino's administration of field sobriety tests to Mr. Blackstone. (SMF, ¶ 50.) Meanwhile, a third officer, Officer Mark Barnes, overheard radio chatter concerning the stop and drove to the scene. He arrived as the first field sobriety test was being conducted. (*Id.*, ¶¶ 75–77.) The first test administered by Officer Quirino was the horizontal gaze nystagmus (HGN) test. (*Id.*, ¶ 53.) During the test, Officer Quirino instructed Blackstone not to move his head and to keep his eyes open, to which Blackstone responded that his eyes were open, that he could see one hundred percent and that Quirino was shining the flashlight into his eyes, which appears, at least from the video, to have been the

case.[5] At one point during the HGN test, Blackstone responds to Officer Quirino's complaints, saying, "What, sir, is your problem?" "My eyes are open," "I've had enough of this crap," "I can see everything one hundred percent," and "I've never drunk."[6] In all, Officer Quirino conducted the test for several minutes. Officer Quirino continued conducting the test for some time after his oral exchanges with Blackstone, without making any further critique of Blackstone's performance and without Blackstone moving his head. Eventually, Officer Quirino simply stopped the test without comment. The appearance from the video is that he had completed administering the test. (*Id.*, ¶¶ 55–56, 59–67.) In his summary judgment affidavit, Officer Quirino indicates that he was unable to determine whether Blackstone was impaired based on the HGN test. (*Id.*, ¶¶ 53, 73; Aff. of Norbert Quirino, ¶ 5.)

Following the HGN test, Officer Quirino proceeded to instruct Blackstone regarding the walk and turn test. He explained that Blackstone should take nine steps forward, heel-to-toe, turn, and take nine more heel-to-toe steps back, all the while counting out loud from one to nine with each successive step. He then demonstrated the test to Blackstone.[7] (*Id.*, ¶¶ 82–86.) From Blackstone's perspective, Officer Quirino "rattled off instructions" and kept

asking, "Do you understand?," a characterization that a jury might credit based on the videotape. (PSAMF, ¶ 36; videotape.) Blackstone indicated that he understood, proceeded to take nine heel-to-toe steps forward, without counting and taking one stutter step without really becoming unbalanced. (SMF, ¶¶ 92, 93; videotape.) Blackstone then inquired how to proceed ("Which way do you want me to turn?"), turned other than as demonstrated, said he could not remember what to do and asked, "Now what do you want me to do? Touch my toes?" (*Id.*, ¶¶ 94–97.) Blackstone advised Officer Quirino that he "didn't have to take this foolish test." (*Id.*, ¶ 99.) Officer Quirino responded that Blackstone did have to take the test and Blackstone indicated that he could prove to Officer Quirino, any way that the officer wanted, that he did not drink. (*Id.*, ¶ 101.) Officer Quirino advised Mr. Blackstone that performing the tests was how he was going to provide proof. (*Id.*, ¶ 102.) Mr. Blackstone's responded, "Bull crap," whereupon Officer Quirino asked Blackstone if he was going to finish the walk and turn test. (*Id.*, ¶ 103.) Blackstone first indicated that he did not remember what Officer Quirino wanted him to do, and then stated, "I think you've got a problem. I think you've got an attitude." (*Id.*, ¶¶ 104, 110.) Officer Quirino asked

5. During his deposition, Blackstone explained that his eyes were irritated from wearing his contact lenses throughout the day and that light from the flashlight and passing vehicles was contributing to the irritation. (SMF, ¶ 63; PSAMF, ¶ 30.)

6. Words cannot adequately capture the look and feel of this back and forth, but suffice it to say that a jury could watch the video and reasonably conclude that Blackstone's statements were born of consternation, not drunkenness or other impairment. Notably, Blackstone does not raise his voice or yell, unlike Officer Quirino. One exchange went as follows:

Blackstone looked over to Officer Theriault and asked, "Is this guy for real?"
Officer Quirino yelled, "You need to continue the test, sir!"
"What are you trying to do?" asked Blackstone.
"I'm conducting a test!"
(Videotape.) I also observe that there was nothing threatening about Blackstone's movements, although he does appear to have a powerful build.

7. I note that Blackstone appears to have stood throughout this instruction with his right foot in front of his left, without wavering at all. (Videotape.)

Blackstone if he was going to continue the walk and turn test and Blackstone again asked if Officer Quirino wanted him to touch his toes. (*Id.*, ¶ 105.) Officer Quirino said he wanted Blackstone to do what had been demonstrated to him, to which Blackstone responded, "I don't remember what you said at all." (*Id.*, ¶ 98.) Officer Quirino was growing frustrated with Blackstone. (PSAMF, ¶ 37.) Officer Quirino did not reinstruct Blackstone, but moved onto his third test. Officer Quirino started administering the one-legged stand test by telling Blackstone not to start until he instructed him to do so. (SMF, ¶ 121.) However, when Officer Quirino demonstrated how Blackstone should lift his leg and began explaining the test, Blackstone started to perform the test. (*Id.*, ¶ 122.) At this point the audio portion of the videotape goes out. (*Id.*, ¶¶ 147, 149.)

From the videotape, it is apparent that Blackstone wavered somewhat and kept his leg raised for only a few seconds. (*Id.*, ¶¶ 123–125; videotape.) Blackstone admits that he told Officer Quirino that he was not going to continue taking the test and that, when Officer Quirino finished explaining the test and advised Blackstone to start, Blackstone refused. (SMF, ¶¶ 126–127.) From Officer Quirino's perspective, Blackstone had failed all three tests and had to be taken to the station for an "intoxilyzer" test. (*Id.*, ¶¶ 128–129.) From Blackstone's perspective, Officer Quirino was extremely brusque and snappy, which was making Blackstone nervous and making it hard for him to relax and perform the tests. (PSAMF, ¶ 33.) According to Blackstone, whose testimony I must credit at this juncture, he requested that he be permitted to just take an intoxilyzer test and indicated that he would cooperate by going down to the station to do so, even in the cruiser. (SMF, ¶¶ 130–132; PSAMF, ¶¶ 41–42.)

It is the policy of the Presque Isle Police Department that officers who are trying to conduct field sobriety tests in order to obtain evidence of possible impairment of a driver are not to simply accept a driver's offer to go to the police station and take an intoxilyzer test. (SMF, ¶ 134.) This policy is to ensure that the officers at the scene of the motor vehicle stop obtain their own evidence of probable cause to arrest by administering standardized field sobriety tests. (*Id.*, ¶ 135.)

According to the defendants, because Blackstone is a large, muscular man, Officer Quirino thought Blackstone would not submit to arrest without resistance, even though he had asked to be taken to the station for a test. (*Id.*, ¶ 146.) According to Blackstone, whose testimony must be credited here, Officer Quirino simply grabbed his left arm, without saying anything on the order of "put your hands behind your back" or "you are under arrest." (PSAMF, ¶¶ 46, 48–49.) As Officer Quirino did so, Officer Theriault stepped in to assist. According to Officer Theriault, he did so because of Blackstone's "demeanor prior to the arrest," which made Officer Theriault "believe[ ] that Officer Quirino [would] encounter physical resistance." (SMF, ¶¶ 151, 153.) Officer Quirino took hold of Blackstone's left wrist, and placed a handcuff on it while Officer Theriault took Mr. Blackstone's right arm at the elbow. (*Id.*, ¶ 154.) At that point, Blackstone stiffened up some, but maintains that he did so in surprise, or reflexively, and not intending to resist. (*Id.*, ¶¶ 156, 162.) In any event, Officer Theriault can be seen in the videotape pulling Blackstone right arm up and behind Blackstone's back quite forcefully. According to the defendants, Officer Theriault did this in order "to control him." (*Id.*, ¶ 159.) Officer Theriault was using a hold known as an "arm bar" on Blackstone, "raising [Blackstone's arm] in an attempt to induce

compliance." (*Id.*, ¶ 160.) The officers then maneuvered Blackstone to the roadside and forced him to the ground to, in their words, "use the ground as leverage against him." (*Id.*, ¶ 163.) According to the officers, they were not in control of Blackstone when they went to the ground, although the videotape permits a contrary conclusion because it appears that they moved Blackstone several feet off the roadway and outside of the camera view quite readily. (*Id.*, ¶ 164; videotape.) This assertion is also belied by Officer Theriault's deposition testimony in which he indicates that the officers were in control as they took Blackstone to the ground.[8] (SMF, ¶ 184; Docket No. 25 at 22.) Through the static, a loud exhalation is heard, presumably as Blackstone impacts the ground with the officers atop him and a moment later Blackstone's voice can be heard exclaiming, "What are you doing?!" (Videotape.) A few seconds after these three go to the ground, Officer Barnes can be seen crossing in front of the camera, moving to join in. (SMF, ¶ 171.) When Officer Barnes arrived, Blackstone was on his stomach with Officer Quirino on his left side and Officer Theriault kneeling on Blackstone's legs, the officers were attempting to handcuff Blackstone, but having difficulty doing so. (*Id.*, ¶ 173.) Officer Barnes leaned down on Blackstone's right shoulder in an attempt to limit the movement of his right arm, which the officers were trying to secure with the handcuffs already attached to Blackstone's left arm. (*Id.*, ¶ 175.) While on the ground, it became apparent to the officers that Blackstone's muscular build was making it difficult to bring his arms close enough together for a single set of handcuffs. (*Id.*, ¶ 176.) During this time, Officer Quirino forcibly pushed Blackstone's face into the sidewalk. (*Id.*, ¶ 182.) [9] According to Blackstone, one of the officers pushed his face and left shoulder into the pavement with force that was extensive, continual and increasing in intensity. (PSAMF, ¶ 50.) Eventually, Officer Quirino was able to complete handcuffing Blackstone by using two sets of handcuffs. (SMF, ¶¶ 177–178.) Blackstone describes having his arms twisted repeatedly until the officer came to the conclusion that two sets of handcuffs were needed. (PSAMF, ¶ 52.) After Blackstone was handcuffed, the officers picked him up off the ground. (SMF, ¶ 179.) Blackstone had a small scrape on the left side of his face, which was not present before the struggle began. (*Id.*, ¶ 180.) Neither Officer Quirino nor Officer Theriault detected any scent of intoxicating beverages emanating from Blackstone. (PSAMF, ¶¶ 12, 13.)

Mr. Blackstone was transported to the Presque Isle Police Department in Officer Barnes cruiser by Officer Barnes and Officer Quirino. (SMF, ¶ 217.) Officer Quirino waited the required 15 minutes to conduct the intoxilyzer test, at which point Mr. Blackstone's blood alcohol result was 0.00%. (*Id.*, ¶ 222; PSAMF, ¶ 53.) Officer Quirino gave Mr. Blackstone a summons for operating under the influence despite the intoxilyzer result, based on his observation of Mr. Blackstone's vehicle operation and performance on the field sobriety

---

8. The defendants filed an "objection" to Blackstone's statement of additional material facts (Docket No. 1 6.) because he failed to file the officers' deposition transcripts along with his other summary judgment papers. I already granted Blackstone's motion for leave to file the deposition transcripts late and, thus, impliedly denied the defendants' objection. To the extent that any ambiguity exists, the "objection" is hereby overruled.

9. I infer that Officer Quirino did the pushing because the officers offer the following statement: "Officer Quirino did not *intentionally* push Mr. Blackstone's face into the sidewalk." (SMF, ¶ 182, emphasis added.)

tests. (SMF, ¶ 225.) Officer Quirino believed that, if the charge was to be dismissed, it should be done by the district attorney's office. (Id.; ¶ 226.) Officer Quirino also summonsed Mr. Blackstone for refusing to submit to arrest. (Id., ¶ 227.) He released Blackstone after approximately 45 minutes delay at the station. (Id., ¶¶ 228–229.) The district attorney's office dismissed the charges against Mr. Blackstone. (Id., ¶ 230.)

## Discussion

Summary judgment is warranted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); United States Steel v. M. DeMatteo Constr. Co., 315 F.3d 43, 48 (1st Cir.2002). When deciding whether a genuine issue of material fact exists, a court must view the available evidence in the light most favorable to the non-moving party and draw all reasonable inferences in the non-movant's favor. Thames Shipyard & Repair Co. v. United States, 350 F.3d 247, 276 (1st Cir.2003).

The parties are in agreement that the City of Presque Isle does not belong in this litigation. Therefore, the motion for summary judgment is granted to the extent that it concerns the claims against the City. To the extent that Blackstone's complaint is unclear about what legal theories he is advancing here, his summary judgment papers clarify that the remaining constitutional issues are "whether the police violated his Fourth Amendment constitutional rights not to be detained without an articulable suspicion or to be arrested without probable cause and to be free from the use of excessive force." In addition, Blackstone maintains "common law claims for false imprisonment, malicious prosecu-

tion and assault." (Docket No. 13 at 2.) The defendant police officers argue that legal violations are not made out by the facts as a matter of law and that, if a genuine issue is raised regarding any of the claims, they are immune to suit. I address whether a factual basis exists for the claims before turning to the issue of immunity.

### A. The Constitutional Claims

■■■■ "The Fourth and Fourteenth Amendments are implicated in this case because stopping an automobile and detaining its occupants constitute a 'seizure' within the meaning of those Amendments, even though the purpose of the stop is limited and the resulting detention quite brief." Delaware v. Prouse, 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). The constitution "impose[s] a standard of 'reasonableness' upon the exercise of discretion by ... law enforcement agents, in order 'to safeguard the privacy and security of individuals against arbitrary invasions.'" Id. at 653–54, 99 S.Ct. 1391 (quoting Camara v. Municipal Court, 387 U.S. 523, 528, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967)). However:

[T]he usual traffic stop is more analogous to a so-called "Terry stop," see Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), than to a formal arrest. Under the Fourth Amendment, [the Supreme Court has] held, a policeman who lacks probable cause but whose "observations lead him reasonably to suspect" that a particular person has committed, is committing, or is about to commit a crime, may detain that person briefly in order to "investigate the circumstances that provoke suspicion." United States v. Brignoni–Ponce, 422 U.S. 873, 881, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). "[The] stop and inquiry must be 'reasonably related in scope to

the justification for their initiation.'" *Ibid.* (quoting *Terry v. Ohio, supra,* at 29, 88 S.Ct. 1868.) Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released.

*Berkemer v. McCarty,* 468 U.S. 420, 439–40, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). In order to determine whether the information acquired by an officer during an investigatory stop is sufficient to justify a warrantless arrest, the totality of the facts and circumstances must establish "probable cause." "[P]robable cause to perform a warrantless arrest turns on 'whether at that moment the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense.'" *Vargas–Badillo v. Diaz–Torres,* 114 F.3d 3, 6 (1st Cir.1997) (quoting *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964)). The Fourth Amendment is also implicated in this case because the officers used a significant amount of force to arrest Blackstone. "[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Like the other as-

pects of the encounter, this, too, is judged by objective reasonableness. "Th[e] inquiry requires the factfinder to consider the reasonableness of the officers' actions from the perspective of a reasonable officer on the scene, rather than through the lens of hindsight. In doing so, the factfinder should take into account 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Isom v. Town of Warren,* 360 F.3d 7, 10 (1st Cir.2004) (quoting *Graham,* 490 U.S. at 396, 109 S.Ct. 1865) (internal citation omitted).

■ Article I, Section 5 of the Maine Constitution imposes complementary restraints on law enforcement officers in the context of traffic stops and warrantless arrests. *State v. Lafond,* 2002 ME 124, ¶ 6, 802 A.2d 425, 427–27 (articulable suspicion to conduct investigatory traffic stop); *State v. Boylan,* 665 A.2d 1016, 1018–19 (1995) (probable cause to arrest). When state officials fail to comply with these standards, they can be made to answer in a lawsuit under either federal civil rights law, 42 U.S.C. § 1983,[10] or state tort law, *See, e.g., Richards v. Town of Eliot,* 2001 ME 132, ¶ 31, 780 A.2d 281, 292 n. 8 (discussing state law tort claims of "illegal arrest" and "excessive force" in regard to police officers).

*1. The initial traffic stop and the administration of field sobriety tests were reasonable.*

■ According to the defendant police officers, there was reasonable suspicion to

---

**10.** "To state a claim under section 1983, a plaintiff must allege two elements: (1) that the conduct complained of has been committed under color of state law, and (2) that this conduct worked a denial of rights secured by the Constitution or laws of the United States." *Barreto–Rivera v. Medina–Vargas,* 168 F.3d 42, 45 (1st Cir.1999) (citing *Martinez v. Colon,* 54

F.3d 980, 984 (1st Cir.1995)). "[Section] 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham,* 490 U.S. at 393–94, 109 S.Ct. 1865 (quoting *Baker v. McCollan,* 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)).

justify the traffic stop because Blackstone's pickup truck was weaving in its lane and straddling the lane dividing line. (Docket No. 11 at 10.) I agree. The videotape plainly shows Blackstone's vehicle weaving in its lane of travel and straddling the lane dividing line. It also appears that his vehicle crosses over the dividing line on at least two occasions. These facts generated articulable suspicion that the truck was being operated by an alcohol-impaired driver. "[T]he Fourth Amendment permits an officer to conduct a brief investigatory stop on the basis of a reasonable, articulable suspicion that criminal activity is afoot" so long as the officer can "articulate more than an 'inchoate and unparticularized suspicion or hunch of criminal activity.'" *United States v. Golab,* 325 F.3d 63, 66 (1st Cir.2003) (quoting *Terry,* 392 U.S. at 27, 88 S.Ct. 1868); *see also United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). In Maine, the criminal offense of operating under the influence is committed if a person drives a motor vehicle and "the person's senses are affected to the slightest degree, or to any extent, by the alcohol that person has had to drink." *State v. Webster,* 2000 ME 115, ¶ 7, 754 A.2d 976, 977–78; *see also* 29–A M.R.S.A. § 2051 ("When a public way has been divided into 2 or more clearly marked lanes for traffic, the following provisions apply. . . . A vehicle must be operated as nearly as practical entirely within a single lane.") When an officer observes a vehicle weaving within a lane of travel and swerving across a lane dividing line, he or she obtains more than a mere hunch that criminal activity may be occurring, assuming that weather, road conditions or other extenuating circumstances do not explain such driving. *See, e.g., United States v. Cervine,* 347 F.3d 865, 870 (10th Cir.2003) ("[O]nce the Trooper observed a traffic violation, such as swerving across the lane

dividing line in violation of [a Missouri traffic law], the subsequent traffic stop was valid.")

The officers also argue that the smell of what seemed to be an alcoholic beverage in the vehicle made reasonable Officer Quirino's request that Blackstone exit the vehicle and perform field sobriety tests. (Docket No. 11 at 11.) This cannot reasonably be gainsaid. That the officers believed they smelled alcohol is not contradicted by Blackstone and, moreover, Blackstone indicates in his own affidavit that he voluntarily complied with Officer Quirino's request that he exit the vehicle and walk toward the cruiser because, in his words, "I am understanding of the fact that he might be wanting a little more proof than my two statements that I am in no way impaired." (Aff. of John Blackstone, attached to Docket No. 15, ¶ 12.) Even if Blackstone could somehow disprove the officers' belief that they smelled an alcoholic beverage, which he does not attempt, the Fourth Amendment does not prohibit an officer from requesting that a citizen conduct sobriety tests and from administering those tests when the citizen voluntarily assents. *United States v. Hornbecker,* 316 F.3d 40, 44–45 (1st Cir. 2003). Thus, the constitutional question in this case becomes whether probable cause existed to arrest Blackstone for operating under the influence and whether, in effectuating Blackstone's arrest, the officers used a reasonable degree of force.

2. *When the totality of the circumstances known to Officer Quirino are viewed in the light most favorable to Blackstone, the existence of probable cause becomes ambiguous.*

A warrantless arrest must be justified by probable cause. *Vargas–Badillo v. Diaz–Torres,* 114 F.3d 3, 6 (1st Cir.1997). The probable cause standard requires that at the time of arrest "the facts and circum-

stances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). However, the summary judgment standard requires that those same facts and circumstances be viewed in the light most favorable to Blackstone and that the court credit every favorable inference that a jury might reasonably draw. *Thames Shipyard*, 350 F.3d at 276. In this case, the facts and circumstances include the weaving of Blackstone's pickup truck, the sweet smell in the truck, the redness of Blackstone's eyes, Blackstone's failure to fully comprehend the instructions regarding the walk and turn test, his failure to count out loud during that test, his failure to turn as instructed and to return to the place he started from during that test, his mistaken belief that he was supposed to touch his toes, and his premature commencement of the one-legged stand test. This is an appreciable amount of data that any officer would consider for purposes of the probable cause analysis. On the other hand, also apparent to Officer Quirino were several countervailing facts and circumstances, including Blackstone's indication that he did not drink, his ability to exit his truck and walk to the cruiser without demonstrating any impairment whatsoever, the absence of any smell of alcoholic beverages on him or on his breath, his ability to walk heel-to-toe for nine steps with virtually no wavering, the steadiness of his stance throughout the encounter and his willingness to go to the station for purposes of a blood-alcohol test. Given the liberal summary judgment standard, which requires that I view all the evidence in the light most favorable to Blackstone, I think it within the bounds of reason that another police officer would have taken note of the absence of any suspicious smell on Blackstone and his ability to converse intelligibly and to stand and walk without any apparent impairment, and would have demonstrated significantly more patience with Blackstone in light of these facts. Put another way, when the *totality* of the circumstances are viewed in the light most favorable to Blackstone, a prudent person would not necessarily consider them a sufficient basis to charge Blackstone with criminal conduct.[11]

3. *A reasonable jury could well conclude that Blackstone did not resist arrest and that the officers used force unnecessarily and to an unreasonable degree in securing Blackstone's arrest.*

█ The reasonableness of a given use of force is informed primarily by "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or at-

**11.** This is something of a technical ruling because the totality of the circumstances were, at the very least, sufficient to justify further roadside testing, something Blackstone was unwilling to do for Officer Quirino. Also problematic is the fact that Blackstone requested to go to the police station, essentially volunteering to be further detained. I also recognize that the Law Court has held, albeit in the context of a motion to suppress, that "[t]he probable cause standard for requiring a person to take a blood alcohol test has a very low threshold. A person is guilty of operating under the influence if his or her senses are impaired however slightly or to any extent by the alcohol that person has had to drink." *Webster*, 2000 ME 115, ¶ 7, 754 A.2d at 978–79. On the other hand, Blackstone was formally placed under arrest by Officer Quirino prior to transport. In any event, I am not blind to the fact that my summary judgment evaluation is very much the product of the 20/20 vision afforded by hindsight, which is precisely why I conclude below that qualified immunity and discretionary function immunity apply to the illegal arrest claims.

tempting to evade arrest by flight." *Graham,* 490 U.S. at 396, 109 S.Ct. 1865. The defendant police officers argue that it is obvious from the videotape that their use of force was reasonable because Blackstone resisted, because the officers had trouble overcoming Blackstone's resistance and because Blackstone suffered no injuries. (Docket No. 11 at 13, 16.) Contrary to the officers' characterization of the videotape, it appears that Blackstone moves toward the road because Officer Theriault applied the arm bar hold and because the two officers steered him that way. It also appears that they quite handily maneuver Blackstone, despite his alleged strength, which is also indicative of a lack of resistance on Blackstone's part. I also observe that Blackstone's body language appears quite passive throughout the encounter, quite contrary to the characterizations made by the officers. And though I credit that Blackstone appears to be a powerful man, I am not inclined to think that that fact justifies the use of violence against him.

The officers make much of Blackstone's initial, reflexive response to being abruptly grabbed, but these facts cannot reasonably justify throwing someone to the ground, piling three officers onto him, forcibly pressing his face into the asphalt and twisting or leveraging his arms beyond their range of motion to fit undersized cuffs. For purposes of summary judgment I simply draw the most favorable inferences to Blackstone I can from the videotape, credit Blackstone's testimony that he was not struggling, and conclude that a jury might find the officers' use of force was not objectively reasonable.

4. *The officers are qualifiedly immune from suit with respect to the seizure, but not with respect to their use of force.*

The Supreme Court's "decisions consistently have held that government officials are entitled to some form of immunity from suits for damages. As recognized at common law, public officers require this protection to shield them from undue interference with their duties and from potentially disabling threats of liability." *Harlow v. Fitzgerald,* 457 U.S. 800, 807, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "In the last analysis, ... qualified immunity purposes to protect government functionaries who could not reasonably have predicted that their actions would abridge the rights of others, even though, at the end of the day, those officials may have engaged in rights-violating conduct." *Camilo–Robles v. Zapata,* 175 F.3d 41, 43 (1st Cir. 1999). In this way, the doctrine of qualified immunity protects a state actor from § 1983 liability in circumstances where the proper application of the underlying constitutional standard might be unclear and, therefore, not otherwise suited for dismissal or summary disposition. With respect to the extent of the protection conferred by the doctrine, it has been said that "the doctrine of qualified immunity leaves 'ample room for mistaken judgments' and protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Berthiaume v. Caron,* 142 F.3d 12, 15 (1st Cir.1998) (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1st Cir.1986)). With respect to the timing of the qualified immunity determination, the Supreme Court has "stressed the importance of resolving immunity questions at the earliest possible stage in litigation," *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991), on the ground that the doctrine confers "an immunity from suit rather than a mere defense to liability," *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).

■ With respect to the decision to arrest Blackstone, I conclude that Officer

Quirino did not knowingly violate the law and was not plainly incompetent. I deem these facts to be so because the weaving of the pickup truck, the redness of Blackstone's eyes, his failure to follow instructions and his ever-so-slight side step during the walk and turn "preclude a finding that there was clearly no probable cause, or that '*no* reasonably competent officer would have found probable cause,'" *Vargas–Badillo,* 114 F.3d at 7 (emphasis added), of impairment to the "slightest degree," *Webster,* 2000 ME 115, ¶ 7, 754 A.2d at 977–78.

 With respect to the decision to apply a painful arm hold, to take Blackstone to the ground, to pile on top of him, force his face into the ground and to wrench his arms, however, I conclude, solely for purposes of summary judgment, that all three officers either participated in a known violation of the law or were plainly incompetent because I am constrained to find that Blackstone offered no resistance to their efforts to place him under arrest, which precludes a finding that any "reasonably well-trained officers confronted with similar circumstances could reasonably believe their actions were lawful under clearly established law." *Napier v. Town of Windham,* 187 F.3d 177, 183 (1999) (citing *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). Thus, summary judgment for the defendant officers will enter on the § 1983 count, in part, to the extent that it seeks to establish liability based on an absence of probable cause.

## B. State Law Tort Claims

 Blackstone identifies his state common law claims as false imprisonment (illegal arrest), assault (excessive force) and malicious prosecution. According to the Law Court, "The analysis of the state law claims of illegal arrest and excessive force is the same as for the federal law claims." *Richards,* 2001 ME 132, ¶ 31, 780 A.2d at 292. As for malicious prosecution, Blackstone must prove "that criminal proceedings were instituted against him without probable cause and with malice, [and] that he received a favorable termination of the proceedings." *Nadeau v. State,* 395 A.2d 107, 116 (Me.1978). All of these claims are subject to the Maine Tort Claims Act, which affords the defendant officers with "discretionary function" immunity:

**Personal immunity for employees; procedure**

1. IMMUNITY. Notwithstanding any liability that may have existed at common law, employees of governmental entities shall be absolutely immune from personal civil liability for the following:

\* \* \* \* \* \*

C. Performing or failing to perform any discretionary function or duty, whether or not the discretion is abused; and whether or not any statute, charter, ordinance, order, resolution, rule or resolve under which the discretionary function or duty is performed is valid[.]

\* \* \* \* \* \*

The absolute immunity provided by paragraph C shall be applicable whenever a discretionary act is reasonably encompassed by the duties of the governmental employee in question, regardless of whether the exercise of discretion is specifically authorized by statute, charter, ordinance, order, resolution, rule or resolve and shall be available to all governmental employees, including police officers and governmental employees involved in child welfare cases, who are required to exercise judgment or discretion in performing their official duties.

14 M.R.S.A. §·8111(1)(C). The defendant officers bear the burden of proving immunity under the Act. *Carroll v. City of Portland,* 1999 ME 131, ¶1, 736 A.2d 279, 281.[12]

1. *Discretionary function immunity bars the illegal arrest claim, but not the excessive force claim.*

■■■■ The Law Court's cases make it apparent that, as is the case with qualified immunity, discretionary function immunity protects police officers from civil liability for warrantless arrests in circumstances where the existence of probable cause is ambiguous. *Id.* ("Discretionary immunity . . . applies unless the defendants' conduct 'clearly exceeded, as a matter of law, the *scope* of any discretion [they] could have possessed in their official capacity as [police officers].'") (quoting *Polley v. Atwell,* 581 A.2d 410, 414 (Me.1990)); 14 M.R.S.A. § 8111(1)(C) (extending immunity for "[p]erforming . . . any discretionary function or duty, whether or not the discretion is abused"). However, where a plaintiff's summary judgment statements of material facts generate a genuine issue on the use of excessive force in making an arrest, as they do here, discretionary function immunity is unavailable because the use of excessive force is "beyond the scope of [an] officer's discretion." *Richards,* 2001 ME 132, ¶32, 780 A.2d at 292. Accordingly, summary judgment will enter against the illegal arrest claim, but not the excessive force claim.

2. *Discretionary function immunity bars the malicious prosecution claim.*

■■■ Blackstone maintains that his malicious prosecution action is made out because Officer Quirino instituted criminal OUI proceedings against him after he blew 0.00% on the intoxilyzer.[13] Pursuant to Maine law, "If a person has a blood-alcohol level of 0.05% or less, it is prima facie evidence that that person is not under the influence of alcohol." 29–A M.R.S.A. § 2432(1). For obvious reasons, when one factors the intoxilyzer test results into the probable cause calculus, it comes as a surprise that Officer Quirino would have considered Blackstone to have committed the OUI offense. It also appears that Officer Quirino himself doubted whether he had a good faith basis for issuing a summons to Blackstone for OUI, considering the defendants' proffer that Officer Quirino thought the district attorney ought to determine whether the charge should be dismissed.[14] Based on these circumstances, it would appear that malicious prosecution is made out. However, even if Officer Quirino instituted process in bad faith, discretionary function immunity insulates him from suit because the decision to charge was inherently discretionary. *See Dall v. Caron,* 628 A.2d 117, 119 (Me.1993) (bad faith is

---

12. In his summary judgment memorandum, Blackstone raises 15 M.R.S.A. § 704, which prohibits state law enforcement from acting "wantonly or oppressively" in making arrests without a warrant. Although this provision may provide an independent cause of action, *see Creamer v. Sceviour,* 652 A.2d 110, 115 (Me.1995) (indicating that the Law Court has "not addressed whether immunity under the MTCA abrogates the statutory remedy in section 704"), Blackstone's complaint does not list a § 704 count, only a MTCA count. In any event, I am not persuaded that the provision would do anything to enhance or detract

from Blackstone's suit, considering that the only possible claim for wanton or oppressive arrest concerns the use of force, which is already going forward under both federal and state law.

13. Blackstone does not state that his malicious prosecution claim is based on the summons he received for resisting arrest.

14. Of course, charges must be pressed before they can be dismissed.

not an exception to the discretionary immunity defense); 14 M.R.S.A. § 8111(1)(C) (conferring discretionary function immunity "whether or not the discretion is abused"). Because there was at least a modicum of evidence to support a finding that Blackstone was impaired to the slightest degree, I conclude that Officer Quirino had discretion to charge Blackstone with OUI. Therefore, summary judgment will enter for the defendants on the malicious prosecution component of Blackstone's "MTCA" count.

### Conclusion

For the reasons stated herein, I **GRANT** the defendants' motion for summary judgment **IN PART**. All claims against the City of Presque Isle are hereby dismissed. Summary judgment will enter for the defendant officers on Counts I and II except to the extent that these counts set forth federal and state law claims of excessive force.

*So Ordered.*