LIPEZ, Circuit Judge.
Appellant Adam Jennings, a member of the Narragansett Indian Tribe, worked at a “smoke shop” operated by the tribe and located on Indian tribal land in Charles-town, Rhode Island. The smoke shop sold an array of cigarettes to members of the tribe and the general public. During a search of the smoke shop by the Rhode Island State Police, Jennings was arrested for disorderly conduct. Jennings initially resisted the arrest, requiring the use of force by state police officials to subdue him. As a result of that confrontation, appellee Kenneth Jones used an “ankle turn control technique” which broke Jen- *112 rungs’ ankle. Jennings brought suit under 42 U.S.C. § 1983 against Jones and other officers, claiming that they had violated his Fourth Amendment rights by using excessive force to restrain him. Jennings also brought a claim under state law for battery.
Although a jury found in favor of most of the defendants, it ruled for Jennings on his excessive force and battery claims against Jones and awarded compensatory damages of $301,100. The district court then granted Jones’ post-verdict motion for judgment as a matter of law, ruling for Jones on all three prongs of the qualified immunity inquiry. It first held that there was no constitutional violation because there was no evidence from which a reasonable jury could have concluded that the force used to subdue Jennings was excessive. It then concluded that, even if there had been a constitutional violation, Jones was entitled to qualified immunity because the relevant law was not clearly established and a reasonable officer would not have believed that the force was excessive and thus in violation of the Fourth Amendment. The court also granted judgment as a matter of law for Jones on the battery claim. Along with his motion for judgment as a matter of law, Jones filed motions for a new trial and a remittitur. In contravention of Federal Rule of Civil Procedure 50, the district court did not rule on these motions.
On appeal, Jennings challenges the court’s determinations on his Fourth Amendment claim. After careful review, we conclude that the court erred in granting qualified immunity to Jones. First, viewing the evidence in the light most favorable to the jury verdict, we conclude that the record establishes that Jones violated Jennings’ constitutional right to be free of excessive force. Second, we find that this right was clearly established at the time of Jennings’ injury. Third, we conclude that a reasonable officer in Jones’ position would have believed that his actions violated Jennings’ constitutional right. Finally, because Jones failed to obtain a conditional ruling on his motions for a new trial and a remittitur before the district court and failed to raise these motions on appeal, we find that he has abandoned these motions. Consequently, we vacate the judgment of the district court and order reinstatement of the jury award.
I.
A. Factual Background
In reviewing a grant of judgment as a matter of law following a jury verdict, “[w]e examine the record as a whole, reading the evidence in the light most favorable to the jury verdict.” Cruz-Vargas v. R.J. Reynolds Tobacco Co., 348 F.3d 271, 275 (1st Cir.2003).
On July 14, 2003, Jennings was at work in a trailer referred to as the “smoke shop” owned and operated by the Narragansett tribe and located on tribal land in Charlestown, Rhode Island. The tribe and the State of Rhode Island were engaged in an ongoing dispute about whether the tribe could sell cigarettes tax-free.[1] Pursuant to this dispute, the Rhode Island State Police had obtained a warrant to seize the cigarettes at the smoke shop, and several plain clothes officers were stationed inside the shop. After uniformed officers arrived in marked cars in the parking lot, the undercover officers inside the shop instructed Jennings to take a *113 seat behind the sales counter. Jennings initially grabbed onto the counter, but then complied and seated himself behind the counter. He also complied when the state police asked him to move to a different seat.
Jennings testified that he was “upset” during these events. He complained loudly that the Rhode Island police had no right to be on his property, and he expressed concern over their treatment of his mother, who was also in the shop. He repeatedly used profanity in his comments.
Eventually, Officer Ken Bell asked Jennings to leave the shop without informing him that he was under arrest for disorderly conduct. A video taken by the state police shows that as Jennings was leaving the shop, an officer issued an order to handcuff him, and Jennings responded, “I’m not getting arrested.” The video also shows that Jennings resisted handcuffing and that several officers subsequently wrestled him to the floor. Jones was one of the officers involved in subduing Jennings. He used an ankle restraint technique called the “ankle turn control technique” to control Jennings’ leg.
During this conflict, the officers repeatedly instructed Jennings to stop resisting and to show them both of his hands because they were concerned that he might have a weapon. Jennings was initially unable to produce his left hand for handcuffing because it was trapped underneath his body. Officer Hill, one of the officers who was attempting to subdue Jennings, testified that he pulled Jennings’ left arm out from under his body. The video shows that Hill then got up and walked away.
Jennings testified that he had ceased resisting before his arm was pulled out from underneath his body. About sixteen months prior to the smoke shop confrontation, Jennings had broken the ankle that Jones was restraining and had surgery performed on it. The officer’s use of the “ankle turn control technique” caused Jennings considerable pain. Jennings informed Jones that the force Jones was using was hurting his previously injured ankle. Jones then increased the amount of force he was using and broke Jennings’ ankle.
On the video, several seconds elapse from the time that Hill got up and left to the time that Jennings yelled in pain as his ankle was broken.[2] Within seconds after Jennings’ injury, the officers brought Jennings to his feet, already handcuffed, and escorted him outside the smoke shop.
B. Procedural History
Jennings brought this action against Jones and several other police officers seeking damages under 42 U.S.C. § 1983 for excessive use of force and for battery under state law.[3] The officers moved for *114 judgment as a matter of law after the close of Jennings’ evidence, raising the qualified immunity defense for the first time.[4] The court denied the motion with respect to Jennings’ excessive force claim against Jones,[5] noting:
There was testimony as to Trooper Jones that he continued twisting the an-ide of Mr. Jennings even after Mr. Jennings had been subdued and even after Mr. Jennings says that he told him that he’d had a previous injury to the ankle and he was breaking the ankle. So as to Detective Jones, there’s enough evidence from which a jury at this point could conclude that the force was excessive.
The court did not explicitly address the issue of qualified immunity. After the close of all the evidence, defendants renewed their motion for judgment as a matter of law, but did not specifically renew their qualified immunity argument. The court again denied the motion with respect to Jennings’ excessive force claim against Jones,[6] explaining:
[W]e have very different versions as to what happened. According to Mr. Jennings, Trooper Jones grabbed his ankle, he wasn’t kicking, he wasn’t doing anything that would warrant it. Trooper Jones grabbed his ankle, twisted his ankle, he told him that he had had previous surgery on the ankle, and that the ankle, he was in the process of breaking his ankle. And according to Mr. Jennings, Trooper Jones actually increased the pressure on the ankle and broke his ankle.... If the jury accepts Mr. Jennings’ version, it might very well find that Trooper Jones used excessive force.
Again, the court did not explicitly address the issue of qualified immunity.
The case was submitted to the jury, which awarded Jennings $301,100 in compensatory damages for his claims against Jones. Following the verdict, Jones moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) on the ground that he was shielded from liability by the doctrine of qualified immunity. Jones also moved for a new trial, or, in the alternative, to amend the judgment by granting a remittitur.
The district court granted Jones’ motion for judgment as a matter of law, concluding that it had erred in submitting the case to the jury to determine whether excessive force was used and ruling for Jones on all three prongs of the qualified immunity inquiry. It first held that there was no constitutional violation because there was no evidence from which a reasonable jury could have concluded that the force used to subdue Jennings was excessive. It then concluded that, even if there had been a *115 constitutional violation, Jones was entitled to qualified immunity because the relevant law was not clearly established and a reasonable officer would not have believed that the force was excessive and thus in violation of the Fourth Amendment. In granting judgment as a matter of law, the court also held that the remaining motions for a new trial and for a remittitur had become moot.[7] This appeal ensued.[8]
II.
The issue before us is whether the district court properly found appellee Jones entitled to qualified immunity from damages. When a defense of qualified immunity is pressed after a jury verdict, we have determined that “the evidence must be construed in the light most hospitable to the party that prevailed at trial.” Iacobucci v. Boulter, 193 F.3d 14, 23 (1st Cir.1999); see also Borges Colón v. Román-Abreu, 438 F.3d 1, 18 (1st Cir.2006) (citing Iacobucci). In such an analysis, “deference should be accorded to the jury’s discernible resolution of disputed factual issues.” Iacobucci, 193 F.3d at 23. Thus, where the jury has issued a general verdict, as it did here, we “view[ ] the facts in the light most favorable to the verdict.” Whitfield v. Meléndez-Rivera, 431 F.3d at 8. This view of the facts persists throughout the three prongs of the qualified immunity analysis. See Borges Colón, 438 F.3d at 19 (rejecting, on the third prong of the qualified immunity analysis, a factual scenario proposed by defendants on the ground that “a jury easily could have found that this was not so”).
In this case, we must take this approach with respect to a critical factual dispute: whether Jones increased the force he applied after Jennings already had ceased resisting for several seconds. Jennings’ claim of excessive force does not rest on the allegation that Jones merely used the ankle turn control technique, but rather that Jones increased the amount of force he applied after Jennings had stopped resisting and stated that Jones was hurting his previously injured ankle. Indeed, this theme of increased force by Jones without justification was the core of Jennings’ case.
Jennings’ opening statement immediately described this version of events to the jury. His attorney stated: “[Ojther witnesses will say that [Jennings] was warning [Jones] that he was breaking his leg. The evidence will show that ... the way [Jones] responded to that information was to twist harder, even though there was no reason to be twisting at all.” At trial, three witnesses testified about Jones’ restraint of Jennings. Jennings himself testified: “It was almost, not just incremental ... I’m telling the guy, look, you’re going to break my ankle and so forth, and he twisted it more.” Similarly, Domingo Monroe, who was seated across the room when the struggle occurred, testified: “Adam Jennings said, you’re hurting my ankle, it was already injured at one point in time ... and then the officer said, well ... if you wouldn’t resist, then your ankle ... wouldn’t be hurting, and then as he said that, he cranked down harder on the ankle.” Finally, Daniel Piccoli testified that he observed the struggle through the open door of the smoke shop:
Q: Mr. Piccoli, could you describe the movements, if any, of the person who was on the floor?
A: There weren’t any.
*116 Q: Did there come a point in time when you heard the person on the floor say something?
A: Yes.
Q: What did you hear him say?
A: He said something in regard to, “let go, you’re going to break my ankle.”
Q: And what, if anything, did the officer who was holding onto his ankle do?
A: Just twisted more.
Jennings’ attorney emphasized this increased use of force in his closing argument:
Now, Adam Jennings himself has testified that he was on the floor, he was saying to somebody ... you’re breaking my ankle or I just had surgery. And you heard testimony that the immediate response was [ ] a greater application of force than there already had been, you heard that from Dan Piccoli.
Near the end of the closing argument, Jennings’ attorney returned to this theme:
[Jones] never increased his force, he said, never decreased it. Now you tell me, if you’ve got constant force on somebody’s ankle and their foot, why at some point does it break? ... [D]id Trooper Jones who had Adam Jennings totally under control, lose it and just decide that because this guy was still complaining, that he was going to teach him a little bit of a lesson and put a little bit more pressure on.
As highlighted by the arguments of counsel,[9] the consistent testimony from Jennings and two eye-witnesses would allow a reasonable jury to conclude that Jones increased, the force he used to restrain Jennings after Jennings had already ceased resisting. This version of events correctly construes the facts “in the light most favorable to the verdict.” Whitfield, 431 F.3d at 8.
The district court failed to view the facts in this light. In its written decision granting judgment as a matter of law to Jones on the basis of qualified immunity, the district court stated that the testimony of the police officers was more credible than the contrary testimony of Jennings, Piccoli and Monroe. Therefore, it did not believe that “Jones continued to twist Jennings’ ankle after Jennings had stopped resisting and was under control.” (Emphasis in original.) However, the district court also correctly noted that it could not grant judgment as a matter of law on that basis. See 9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2524 (2d ed.l995)(explaining that, in granting judgment as a matter of law, a court “is not free to weigh the parties’ evidence or to pass on the credibility of witnesses or to substitute its judgment of the facts for that of the jury.”)(internal footnotes omitted). Instead, the court granted judgment as a matter of law on the basis of qualified immunity, finding that Jennings had not presented evidence from which the jury could conclude that the force used to subdue Jennings was excessive, and that, in any case, Jones was entitled to qualified immunity because the relevant law was not clearly established and a reasonable officer would not have believed that the force was excessive and thus in violation of the Fourth Amendment.
*117 We reserve discussion of the court’s ultimate ground for granting judgment as a matter of law for our qualified immunity analysis in the next section of this opinion. Here, we wish only to emphasize an important inconsistency in the district court’s analysis of the evidence. The court acknowledged that it could not supplant the jury’s view of the facts with its own. Assessing credibility was the jury’s role, and, as the court also acknowledged, the evidence permitted a reasonable finding by the jury that Jones increased the force he used after Jennings had ceased resisting. Yet the district court’s qualified immunity analysis incorporated its skepticism about the jury’s fact-finding on the critical issue of whether Jones increased his use of force. At one point, the court stated in its decision that “the jury determined that Jones’ use of the ankle turn control technique amounted to excessive force.” (Emphasis added.) Later, it referred to Jones “maintaining” the ankle hold after Jennings ceased resisting. Given the witness testimony discussed above, the district court’s characterization is incomplete. Jennings and his two witnesses testified that Jones increased his force after Jennings ceased resisting, and we adopt this view of the evidence in accordance with the principle that we take facts in the light most favorable to the verdict.
The dissent intimates that the jury’s fact-finding role may be different in a case involving qualified immunity, noting our prior statement that “the Supreme Court has not clearly indicated whether the judge may act as fact-finder when there is a factual dispute underlying the qualified immunity defense or whether this function must be fulfilled by a jury.” Kelley v. LaForce, 288 F.3d 1, 7 n. 2 (1st Cir.2002). The dissent also claims that, by taking the facts in the light most favorable to the jury verdict, we engage in “a bit of legal fiction.” It argues that we have no way of knowing what facts the jury found, and lists the various factual scenarios that the jury might have found in a lengthy footnote.[10] Finally, it suggests that the jury may have reached a compromise verdict.[11]
The dissent’s speculations ignore the fundamental principle that, in civil actions, our federal judicial system “distributes trial functions between judge and jury and, under the influence — if not the command- *118 of the Seventh Amendment, assigns the decisions of disputed questions of fact to the jury.” Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 432, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996) (citation omitted). Indeed, we acknowledged this principle in Kelley by stating that “when facts are in dispute, “we doubt the Supreme Court intended this dispute to be resolved from the bench by fíat.’ ” Kelley, 288 F.3d at 7 n. 2 (quoting Prokey v. Watkins, 942 F.2d 67, 72 (1st Cir.1991)). Consistent with this principle, other courts have taken the facts in the light most favorable to the jury verdict in reviewing a district court’s grant of judgment as a matter of law in cases involving qualified immunity. See, e.g., Settlegoode v. Portland Pub. Schs., 371 F.3d 503, 503 (9th Cir.2004)(“Many facts were hotly disputed at trial. We state them here consistent with the verdict.”); Tamez v. City of San Marcos, 118 F.3d 1085, 1091 (5th Cir.1997)(“[W]e consider all of the evidence in the light most favorable to the nonmoving party.”); Henderson v. DeRobertis, 940 F.2d 1055, 1057 (7th Cir.1991)(“We must view all the evidence and inferences in the light most favorable to [plaintiffs], who prevailed with the jury; any conflicts in the evidence must be resolved in favor of those [plaintiffs] and every permissible inference must be drawn in their favor.”).
In this case, the only view of the evidence consistent with the principle that we take the facts in the light most favorable to the jury verdict is that Jones increased the force he used to restrain Jennings after Jennings had ceased to resist and after Jennings had announced his prior ankle injury. That increased use of force broke Jennings’ ankle. Our acceptance of these facts is no legal fiction. It is an acknowledgment of the deference that we must give to juries in the performance of their fact-finding role.
With this controlling legal principle in mind, and the view of the evidence required by that principle, we turn to the legal question of Jones’ entitlement to qualified immunity. Our review is de novo. Whitfield, 431 F.3d at 6.
III.
The Supreme Court explained the process for determining qualified immunity in Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Saucier held that a court first must determine whether “the facts alleged show the officer’s conduct violated a constitutional right.” Id. at 201, 121 S.Ct. 2151. Second, the court must determine whether the right was “clearly established” so that “it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.” Id. at 201-02, 121 S.Ct. 2151. The Supreme Court emphasized that the constitutional question must be decided before determining whether the right was clearly established to facilitate the elaboration of the law. See id. at 201, 121 S.Ct. 2151.
We have typically applied Saucier using a three-part test in which we inquire:
(1) whether the claimant has alleged the deprivation of an actual constitutional right; (2) whether the right was clearly established at the time of the alleged action or inaction; and (3) if both of these questions are answered in the affirmative, whether an objectively reasonable official would have believed that the action taken violated that clearly established constitutional right.
Starlight Sugar, Inc. v. Soto, 253 F.3d 137, 141 (1st Cir.2001); see also Wilson v. City of Boston, 421 F.3d 45, 52 (1st Cir.2005). Although this inquiry subdivides the second prong of the Saucier analysis into two separate questions, it is functionally identical to that analysis. Thus, we turn to this *119 three-pronged inquiry, mindful of our obligation to evaluate any disputed evidence in the light most favorable to the jury verdict. Specifically, as we have already explained, we must take the view that Jones increased the pressure on Jennings’ ankle after Jennings stopped resisting the officers and stated that the force used was hurting his previously injured ankle.
A. Prong One: The Constitutional Violation
In granting Jones’ motion for judgment as a matter of law, the district court indicated that Jennings had not presented sufficient evidence for a reasonable jury to find that Jones had used excessive force in violation of the Constitution.[12] To explore this question, we must first examine what constitutes excessive force under the Fourth Amendment, and then determine whether the evidence presented here was sufficient to support the jury verdict.
To establish a Fourth Amendment violation based on excessive force, a plaintiff must show that the defendant officer employed force that was unreasonable under the circumstances. See Graham v. Connor, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Whether the force used to effect a particular seizure is reasonable “must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.” Id. at 396, 109 S.Ct. 1865. The reasonableness inquiry is objective, to be determined “in light of the facts and circumstances confronting [the officers], without regard to their underlying intent or motivation.” Id. at 397, 109 S.Ct. 1865. There must be “careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.” Id. at 396, 109 S.Ct. 1865.
We recognize the difficult situation confronting the police. It is undisputed that Jennings was challenging authority and resisting arrest. For much of the struggle, the police could not see Jennings’ hands, and they reasonably could have believed that he might have a weapon. In making an arrest, a police officer has “the right to use some degree of physical coercion or threat thereof to effect it.” Id. The fact that Jennings’ ankle was broken does not, in itself, prove a constitutional violation: “[T]he use of force is an expected, necessary part of a law enforcement officer’s task of subduing and securing individuals suspected of committing crimes.” Lee v. Ferraro, 284 F.3d 1188, 1200 (11th Cir.2002).
However, the focus of Jennings’ excessive force claim was not merely Jones’ use of force, but rather Jones’ increased use of physical force after Jennings had ceased resisting for several seconds and stated that the force Jones was using was hurting his previously injured ankle. Jennings used one of Jones’ own witnesses to help establish that such force was unreasonable. Defendants initially called Officer Delaney, an instructor at the Rhode Island State *120 Police Training Academy, to provide testimony about the training of officers and the use of various restraint techniques. During Jennings’ cross-examination the parties agreed to treat Delaney as an expert witness.[13] Delaney testified that the ankle turn control technique is taught to police officers as “a compliance technique and a restraint technique devised to control somebody from kicking.” These techniques are taught in conjunction with the “Use of Force Continuum,” a chart explaining that the degree of force that an officer uses should correlate with the degree of resistance offered by the arrestee. On cross-examination, Delaney testified that it was appropriate for an officer to continue to apply the ankle turn control technique after a suspect stops kicking:
Q: [If] Adam Jennings is not kicking and his hands have been put behind his back and officers are attempting to put the flex cuffs on him ... would it be appropriate for an officer in the position of Trooper Jones to still be twisting his ankle?
A: It would be appropriate for him to maintain that control over the leg.
(Emphasis added.)
However, Delaney’s testimony about the continuum of force also supports the view that it would be unreasonable for an officer to increase his use of force when an arrestee has ceased to resist. Delaney testified during cross-examination that the continuum of force was a “two way street,” meaning that, if the level of resistance changes, the level of force should be adjusted upward or downward correspondingly:
Q: [E]ven if an officer feels at one point in time that one level of force is appropriate, he is supposed to adjust the amount of force he uses in response to a lessening of the arrestee; isn’t that true?
A: Yes. That would be the Trooper’s own assessment of where that lies, yes, sir.
Still on cross-examination, Delaney testified further:
Q: You don’t get stuck at any level, an officer has to be cognizant of what’s going on during the arrest and adjust his use of force accordingly, right?
A: Correct.
The district court’s jury instructions noted that a factor in determining excessive force is whether “the degree of force used and also whether the degree of force was proportional to what was appropriate under the circumstances.” Moreover, Jennings’ closing argument specifically connected the content of Delaney’s testimony to Jones’ increased use of force:
Now, the Judge is going to instruct you that, as does the Use of Force Continuum ... what goes up can come down and should come down if there’s no need any longer to be applying that kind of force. Now, Adam Jennings himself has testified that he was on the floor, he was *121 saying to somebody ... you’re breaking my ankle or I just had surgery. And you heard testimony that the immediate response was [ ] a greater application of force than there already had been....
Thus, guided by the court’s instructions on proportional force, the jury could conclude from Delaney’s testimony that it would have been unreasonable for an officer to increase the pressure on Jennings’ ankle several seconds after Jennings stopped resisting arrest and, moreover, stated that the pressure already applied was hurting his previously injured ankle.
The district court considered Delaney’s testimony. It noted that “Delaney did acknowledge that the continuum of force was a ‘two-way street,’ meaning that, if the level of resistance changes, the level of force used should be adjusted upward or downward to correspond to what is appropriate at the level of resistance.” Critically, though, the court failed to relate Delaney’s testimony to the view of the evidence that we must take in light of the jury verdict. It explained that “Delaney testified that it would have been appropriate for Jones to maintain the ankle turn control technique even if Jennings was not kicking and the officers were ‘just trying to get the flex cuffs on him.’ ” (Emphasis added.) However, Jones did not simply maintain the ankle turn control technique after Jennings gave up resistance; rather, he increased pressure to the point that he broke Jennings’ ankle.
In finding that a reasonable jury could not have concluded that Jones used excessive force, the district court relied on our decision in Isom v. Town of Warren, 360 F.3d 7 (1st Cir.2004). In that case, the police used pepper spray on Robert Isom, a “distraught, seemingly suicidal man, who had briefly held two hostages and was refusing to comply with continuous officer requests that he put down an axe.” Id. at 11. After the spray stopped, Isom “responded not by dropping to the ground, as the officer had hoped, but by raising the axe and running toward two officers.” Id. at 8. The officers then shot and killed Isom. Id.
At trial, the representative of Isom’s estate argued that the use of pepper spray in that situation was “a colossal misjudgment, resulting in a needless and wrongful death,” and that no reasonable officer would have used pepper spray under such circumstances. Id. However, we found this argument inadequately supported because “[i]n the presence of such danger, the plaintiffs could not prevail at trial without providing evidence that would bring into question the officers’ judgment call to use pepper spray.” Id. at 11. Because the plaintiff did not present any such evidence, we found that “[tjhere was no evidence from which the jury could rationally draw the conclusion that the officers’ actions were objectively unreasonable.” Id. at 12.
The district court held that this case is “markedly similar to Isom,” quoting Isom’s explanation for finding that the plaintiff had not presented sufficient evidence:
No expert testified that, under the circumstances faced by Detective Clancy, no reasonable officer would have used pepper spray; in fact, the plaintiffs did not produce any expert testimony at all. Nor did the plaintiff produce any written policy or text stating that the use of pepper spray in circumstances such as those faced by Clancy was not reasonable.
Id. The district court also emphasized Isom’s holding that, “[f]or the jurors to have been given an opportunity to exercise their common sense on the ultimate question of whether no objectively reasonable officer would have used pepper spray, *122 there must have been some basis in the evidence on which to ground that determination.” Id. Relying on these propositions from Isom, the district court found that
there was an absence of any evidence that ‘no objectively reasonable officer’ would have used the level of force used by Jones and, therefore, the jury unfairly was put in the untenable position of trying to decide that question without sufficient evidence of the applicable standard for measuring the lawfulness of Jones’ conduct.
As a result, the district court concluded that in this case, as in Isom, there was no basis in the evidence to support a jury finding of excessive force.[14]
Contrary to the district court’s assessment, this case differs from Isom in two important respects. First, in contrast to the plaintiff in Isom, Jennings did provide expert testimony about the use of force. He directed the jury to the testimony of Officer Delaney on the Use of Force Continuum, a concept relevant to the court’s own instructions about the proportionality of force under the circumstances. As described above, Jennings’ closing argument emphasized that “the Judge is going to instruct you that, as does the Use of Force Continuum, like I said, what goes up can come down and should come down if there’s no need any longer to be applying that kind of force.” Thus, unlike the plaintiff in Isom, Jennings explicitly directed the jury to expert testimony in the record that could assist the jury in determining that no reasonable officer under the circumstances Jones confronted would have applied more pressure to Jennings’ ankle.
We acknowledge that the expert testimony in this case was not precisely the sort described in Isom. As the district court noted, “[n]o expert testified that, under the circumstances faced by [Jones], no reasonable officer would have” acted as Jones did. Isom, 360 F.3d at 12. In fact, Delaney testified to the contrary on redirect examination by the government:
Q. Did Officer Ken Jones use force that you would consider reasonable under the circumstances?
A. Yes.
However, Officer Delaney’s testimony in response to the next few questions makes clear that he did not make his assessment with the relevant factual circumstances in mind. When asked what factors informed his finding of reasonableness, Delaney explained:
The fact that, you know, the suspect did not comply with the order of arrest, that he was assaultive, he was trying to kick the Trooper and he was offering enhanced defiance by bringing his arms in, at that point the appropriate application of force, which was the technique employed by Trooper Jones.
(Emphasis added.) The factors Delaney fists all occurred prior to the time that Jennings ceased to resist, and Delaney’s testimony thus indicates only that the use of force was reasonable “at that point” in time. Given that, viewing the evidence in the fight most favorable to the verdict, Jones increased the force he used after Jennings ceased resisting, Delaney’s expert testimony about the Use of Force *123 Continuum actually supports a finding that the force Jones used was excessive.
Second, although this case happened to include expert testimony by Officer Delaney, we do not read Isom to require such testimony to support a finding that an officer’s use of force was unreasonable.[15] Isom requires only that “there must have been some basis in the evidence on which to ground” a finding of excessive force, leaving open the possibility that some cases may be susceptible to a common sense determination by the jury. Isom itself involved pepper spray, a substance whose use may be unfamiliar to many jurors, and consequently the question of whether it is reasonable to use pepper spray in an attempt to subdue a distraught but threatening suspect may have been best addressed through expert testimony. By contrast, this case involves the common sense proposition that it is not reasonable for police officers to increase their use of physical force after an arrestee who has been resisting arrest stops resisting for several seconds and warns the officers that they are hurting his previously injured anide. Although Officer Delaney did not offer expert testimony that no reasonable officer would have acted as Jones did under the circumstances, he did offer expert testimony that gave the jury a useful framework for thinking about the excessive force issue. Thus informed, the jurors were in a better position to apply their common sense to the facts of this case.[16]
Other courts have recognized that some factual scenarios permit common sense determinations by the jury as to whether the police used excessive force. In Kopf v. Skyrm, 993 F.2d 374, 379 (4th Cir.1993), the Fourth Circuit noted:
[A] blanket rule that expert testimony is generally admissible in excessive force cases would be just as wrong as a blanket rule that it is not.
The facts of every case will determine whether expert testimony would assist the jury. Where force is reduced to its most primitive form — the bare hands— expert testimony might not be helpful.
See also Adewale v. Whalen, 21 F.Supp.2d 1006, 1014 (D.Minn.1998) (“If plaintiffs version of the facts is believed, the jury could conclude without expert testimony that [defendant] used excessive force, and that his actions caused plaintiffs broken arm.”). This case, involving force applied with bare hands, did not require expert testimony to establish whether the force used was reasonable.
In keeping with our decision in Isom, a reasonable jury could have exercised its common sense, informed by Officer Delaney’s expert testimony, to find that Jones used excessive force by increasing pressure on Jennings’ ankle after Jennings stopped resisting for several seconds and stated that Jones was using force that hurt his previously injured ankle. Consequently, we conclude that Jones violated Jennings’ Fourth Amendment right to be free from an unreasonable seizure.
*124 B. Prong Two: Whether the Law Was Clearly Established
The second prong of the qualified immunity analysis asks “whether the constitutional right ... was ‘clearly established’ at the time of the incident such that it would ‘be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.’ ” Riverdale Mills Corp. v. Pimpare, 392 F.3d 55, 65 (1st Cir.2004) (quoting Saucier, 533 U.S. at 202,121 S.Ct. 2151). We consider whether existing case law gave the defendants “fair warning that their conduct violated the plaintiffs constitutional rights.” Suboh v. Dist. Attorney’s Office of Suffolk, 298 F.3d 81, 93 (1st Cir.2002). In other words, the law is clearly established either if courts have previously ruled that materially similar conduct was unconstitutional, or if “a general constitutional rule already identified in the decisional law [applies] with obvious clarity to the specific conduct” at issue. United States v. Lanier, 520 U.S. 259, 271, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997). We therefore consider whether materially similar cases or general Fourth Amendment principles gave Jones fair warning that it was unconstitutional for police officers to increase their use of physical force after an arrestee who has been resisting arrest stops resisting for several seconds and warns them that they are hurting his previously injured ankle.
We conclude that Jones had such notice. In Smith v. Mattox, 127 F.3d 1416 (11th Cir.1997), the Eleventh Circuit denied qualified immunity to a police officer accused of breaking the plaintiffs arm while putting on handcuffs.[17] According to the plaintiff, he was at his mother’s house when a uniformed police officer, acting on a tip from an informant, entered the yard. The plaintiff then “raised [a] baseball bat in a threatening posture” and ignored the officer’s order to drop it. Id. at 1418. When the officer threatened to shoot, the plaintiff fled. He soon encountered the police officer again, and then plaintiff “docilely submitted to arrest upon [the officer’s] request for him to ‘get down.’ ” Id. In the process of putting on handcuffs, the officer bent the plaintiffs arm in a way that caused discomfort. Id. When the plaintiff complained, the police officer, “with a grunt and a blow — but no sign of anger,” broke his arm so severely that it required surgery for multiple fractures. Id. The court concluded that such use of force would be excessive and that the officer was not entitled to qualified immunity. Id.
Although Smith helps to demonstrate that the law protecting Jennings from Jones’ increased use of force was clearly established, our conclusion does not depend on this strikingly similar case. Instead, Smith emphasizes the obvious unconstitutionality of increasing the force used on an arrestee to such a degree that a broken ankle results, after the arrestee has ceased resisting for several seconds and stated that the force already used is hurting his previously injured ankle. The Supreme Court has explained that
general statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though ‘the very action in question has [not] previously been held unlawful.’
*125 Lanier, 520 U.S. at 271, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) (citation omitted). Accordingly, we conclude that Jones’ conduct was such an obvious violation of the Fourth Amendment’s general prohibition on unreasonable force that a reasonable officer would not have required prior case law on point to be on notice that his conduct was unlawful. Indeed, even in Smith, which was decided six years before the incident at issue here, the court concluded that the law was clearly established against the use of increased force on a suspect no longer offering resistance because “the unlawfulness of the conduct is readily apparent even without clarifying easelaw.” 127 F.3d at 1420.[18]
Other circuits have rejected qualified immunity without a prior case exactly on point. In Rice v. Burks, 999 F.2d 1172 (7th Cir.1993), the Seventh Circuit noted that a plaintiff can defeat a qualified immunity defense
without identifying a closely analogous case if he show[s] that the force used was so plainly excessive that the police officers should have been on notice that they were violating the Fourth Amendment. Indeed, police officers should not be shielded from liability just because their excessive use of force happens to be original.
Id. at 1174 (internal citations omitted). Similarly, other courts have found that case law is not required where the constitutional violation is obvious. See, e.g., Gray ex rel. Alexander v. Bostic, 458 F.3d 1295, 1306 (11th Cir.2006)(rejecting qualified immunity for handcuffing compliant nine-year-old girl because “[e]ven in the absence of factually similar case law, an official can have fair warning that his conduct is unconstitutional when the constitutional violation is obvious”); Smith, 127 F.3d at 1419 (stating that law is clearly established when “the official’s conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law”); Casteel v. Pieschek, 3 F.3d 1050, 1053 (7th Cir.1993) (stating that plaintiffs may show that the violation was clearly established using “either a closely analogous case or evidence that the defendants’ conduct is so patently violative of the constitutional right that reasonable officials would know without guidance from the courts”).
Although the dissent professes to accept, arguendo, that Jones increased the force he used to restrain Jennings after Jennings had ceased resisting for several seconds, it continues to describe a different version of events with the cases it cites to show that the law was not clearly established. Some of these cases involve the use, rather than the increase, of force.[19] Others are inapplicable because the arres- *126 tee was still resistant.[20] Critically, these cases do not address the key conduct at issue here: the increased use of force on a previously resisting but now non-resisting arrestee.[21] The dissent’s reliance on such cases demonstrates its refusal to acknowledge that Jones’ increased use of force was integral to Jennings’ excessive force claim and that, consistent with our obligation to take the facts in the light most favorable to the jury verdict, we must accept this version of the facts in evaluating qualified immunity.
When an individual has been forcibly restrained by several officers, has ceased resisting arrest for several seconds, and has advised the officers that the force they are already using is hurting a previously injured ankle, we cannot think of any basis for increasing the force used to such a degree that a broken ankle results. At the time of Jones’ action, both existing caselaw and general Fourth Amendment principles had clearly established that this use of force was excessive in violation of the Constitution.
C. Prong Three: Whether a Reasonable Officer Would Have Believed a Violation Occurred
The final prong of the qualified immunity analysis is “whether an objectively reasonable official would have believed that the action taken violated that clearly established constitutional right.” Starlight, 253 F.3d at 141. As we have previously explained, “[i]t is not always evident at the time an official takes an action that a clearly established right is involved. For example, the factual situation might be ambiguous or the application of the legal standard to the precise facts at issue might be difficult.” Riverdale Mills, 392 F.3d at 61. Thus, even if an officer’s conduct violated clearly established Fourth Amendment law, he may still be eligible for qualified immunity if he was reasonably mistaken as to the degree of force he should have used.
At first glance, this inquiry appears indistinguishable from that in the first prong. Both involve the reasonableness of the officer’s conduct. However, the key distinction is that prong one deals with whether the officer’s conduct was objectively unreasonable, whereas prong three deals with whether an. objectively reasonable officer would have believed the conduct was unreasonable. See Saucier, 533 U.S. at 204-05, 121 S.Ct. 2151 (explaining that “claims of excessive force in the context of arrests ... should be analyzed under the Fourth Amendment’s ‘objective reasonableness standard’ ” but that “[i]f the officer’s mistake as to what the law requires is reasonable ... the officer is entitled to the immunity defense” (internal citation omitted)).
The third prong analysis seems nonsensical at first blush because, in effect, officers receive protection if they acted reasonably in exercising unreasonable force. In Anderson v. Creighton, 483 U.S. 635, 643, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), the Supreme Court acknowledged the argument made by the appellant in that case that “[i]t is not possible ... to say that one ‘reasonably’ acted unreasonably.” However, the Court excused this apparent contradiction as merely linguistic, explaining:
*127 We have frequently observed, and our many cases on the point amply demonstrate, the difficulty of determining whether particular searches or seizures comport with the Fourth Amendment. Law enforcement officers whose judgments in making these difficult determinations are objectively legally reasonable should no more be held personally liable in damages than should officials making analogous determinations in other areas of law.
Id. at 644, 107 S.Ct. 3034 (internal citation omitted). Thus, qualified immunity affords protection to officers who reasonably, yet mistakenly, employ excessive force in violation of the Fourth Amendment.
Again, we are sympathetic to the situation that Jones confronted. Jennings had to be subdued while he was resisting arrest, and the chaos caused by his struggle may have made it difficult for Jones to gauge the appropriate level of force. These circumstances would arguably allow a reasonable officer in Jones’ circumstances to believe that it was lawful to maintain the level of force he used even after Jones ceased resisting.
However, we reiterate that we must take the facts in the light most favorable to the jury verdict. See, e.g., IacobuCci v. Boulter, 193 F.3d 14, 23 (1st Cir.1999). Thus, we accept that Jones increased, rather than merely maintained, the force he applied to Jennings’ ankle, even after Jennings had ceased resisting and stated that Jones was hurting his previously injured ankle.[22]
Under such circumstances, even the “added measure of protection” provided by the third prong of the qualified immunity analysis does not insulate Jones from damages. Cox v. Hainey, 391 F.3d 26 (1st Cir.2004). We find that an objectively reasonable officer in Jones’ circumstances would not have believed that it was lawful to increase the amount of force that he used after Jennings ceased resisting and stated that Jones was hurting him.[23]
Because the first and third prongs of the qualified immunity analysis are so closely related in these Fourth Amendment excessive force cases, the evidence that supports our conclusion on the first prong, that a reasonable jury could have found that the force Jones used was unreasonable, is likewise relevant here, on the third prong, to demonstrate that an objectively reasonable officer in Jones’ position would have believed that the force used was unreasonable. More specifically, Officer Delaney’s testimony about the training that officers receive and the Use of Force Continuum is relevant both to the prong one question of whether there was a violation at all and to the prong three question, which we ad *128 dress here, of whether a reasonable officer in Jones’ circumstances would have believed that his conduct violated the Constitution.
Officer Delaney’s testimony about the training that officers undergo and the Use of Force Continuum made clear that officers should adjust their force in a manner proportional to the resistance offered by the arrestee. Instead, Jones adjusted his force inversely, increasing the force he used after Jennings stopped resisting and stated that the restraint was causing him pain. Under such circumstances, a reasonable officer would have believed that increasing his use of force would violate Jennings’ constitutional right to be free from excessive force.[24]
The district court concluded that Jones was entitled to qualified immunity because a reasonable officer in his position would not have believed that his conduct violated Jennings’ constitutional rights. However, this conclusion again indicates that the court did not construe the facts in the light most favorable to the jury verdict. In discussing the third prong of the qualified immunity analysis, the court stated that “the evidence clearly demonstrates that, even if he was mistaken, Jones reasonably could have believed that his utilization of the ankle turn control technique was lawful.” (Emphasis added.) As we have repeatedly emphasized, the conduct at issue was not the mere utilization of the technique, but rather the increase of force after Jennings ceased resisting. It is this increased force that an objectively reasonable officer would not have believed was lawful.
The dissent once again avoids the central issue — Jones’ use of increased force on a nonresisting arrestee — by describing Jones’ conduct and Delaney’s testimony in sanitized terms. It states that “Jones testified that he tried to secure Jennings’ ankle,” emphasizes Delaney’s testimony that “it was appropriate for Jones to continue using the same compliance technique,” and refers repeatedly to the “use” of the ankle turn control technique. (Emphases added.) These characterizations ignore the view of the facts we must take in light of the jury verdict and, consequently, result in a misapplication of the qualified immunity analysis.
In light of the circumstances, we hold that a reasonable officer in Jones’ position would have believed that increasing the force with which he restrained Jennings was a violation of Jennings’ constitutional right to be free from excessive force. Thus, Jones is not entitled to qualified immunity.
IV.
At the close of trial, Jones filed a motion for judgment as a matter of law and alternative motions for a new trial and a remit-titur. After granting his motion for judgment as a matter of law, the district court held that the alternative motions were moot. This holding was error. Federal Rule of Civil Procedure 50(c)(1) requires the district court to rule conditionally on such motions in the event that the grant of judgment as a matter of law is overruled *129 on appeal. However, Jones made no request that the district court rule on the motions after it said they were moot. Critically, on appeal, Jones has not raised any argument for a new trial or a remitti-tur, and, indeed, has not even mentioned that he filed these motions before the district court.
As a supplement to the basic rule that parties must raise their arguments on appeal to preserve them, Rule 50 alerts parties who have received a favorable grant of judgment as a matter of law (but whose alternative motion for a new trial has been conditionally denied) that, on appeal, they should raise arguments for a new trial to protect themselves in case the appellate court reverses. In light of Jones’ failure to obtain a conditional ruling on his motions for a new trial and a remit-titur from the district court and his complete silence on appeal as to these motions, we follow the approach adopted by four of the five courts of appeals that have considered this situation and find that Jones has abandoned these motions.[25]
A. Rule 50
As noted, the district court erred in failing to dispose of the motions for a new trial and a remittitur.[26] Rule 50 explains that, “[i]f the renewed motion for judgment as a matter of law is granted, the court shall also rule on the motion for a new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed.” Fed.R.Civ.P. 50(c)(1). The court similarly erred in failing to dispose of the motion for a remitti-tur, which, pursuant to Rule 59(e), is inextricably linked to a motion for a new trial. In ruling on these related motions,
the court may condition a denial of the motion for a new trial upon the filing by the plaintiff of a remittitur in a stated amount. In this way the plaintiff is given the option of either submitting to a new trial or of accepting the amount of damages that the court considers justified.
11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2815 (2d ed.1995). Thus, the principles applicable to a motion for a new trial logically govern a motion for remitti-tur.
Although Rule 50 does not explain the consequences of a district court’s failure to issue a conditional grant or denial of a motion for a new trial, this silence is not surprising: “[rjules seldom contemplate what will happen if they are disregarded.” Mays v. Pioneer Lumber Corp., 502 F.2d 106, 110 (4th Cir.1974). However, by its explicit terms, Rule 50 alerts a party who has received judgment as a matter of law that he should protect himself on appeal by raising his arguments for a new trial. Rule 50(c)(1), which discusses situations in which a renewed motion for judgment as a matter of law is granted, states that, “[i]n case the motion for a new trial has been conditionally denied, the appellee on appeal may assert error in that denial.” This language describes a situation closely analogous to that in which Jones found *130 himself. Like the Rule 50(c)(1) appellee, Jones won judgment as a matter of law from the court. Like the Rule 50(c)(1) appellee, Jones did not receive a favorable ruling on his new trial motion from the district court. Thus, Rule 50(c)(1) provides for a party who has prevailed on a motion for judgment as a matter of law but who has not received a favorable ruling on a motion for a new trial to “assert error” by arguing in the alternative that the district court should have granted his motion for a new trial, in the event that the grant of judgment as a matter of law is reversed on appeal.[27]
The dissent argues that because the district court held Jones’ motion for a new trial moot rather than denying the motion, Jones had no responsibility to raise the new trial issue on appeal. However, Rule 50(c)(1) clearly contemplates that, whether a motion for a new trial is conditionally granted or denied, that conditional ruling will come before the court of appeals along with the favorable ruling of the trial court on the defendant’s motion for judgment as a matter of law. If the trial court conditionally grants the defendant’s motion for a new trial in conjunction with granting the defendant’s motion for judgment as a matter of law, the plaintiff will include that conditional ruling on the new trial motion in its appeal.[28] If the trial court denies the defendant’s motion for a new trial in conjunction with granting the defendant’s motion for judgment as a matter of law; the defendant, as appellee, should challenge that ruling on appeal.[29] The position of the dissent — that the district court’s erroneous mootness “ruling” on Jones’ motion for a new trial absolved Jones of any responsibility to raise the new trial motion on appeal — contravenes the objective of Rule 50(c)(1): to allow the court of appeals to address the rulings on the motions for judgment as a matter of law and a new trial at the same time.
That objective is unmistakable from the language of Rule 50(c)(1), and that language gave Jones notice that, as a Rule 50(c)(1) appellee, he should have protected himself on appeal despite the trial court’s erroneous mootness ruling on his new trial motion.[30] Moreover, even curso *131 ry research reveals many cases in which a party who received a favorable grant of judgment as a matter of law raised, on appeal, the fact that the district court failed to rule conditionally on its motion for a new trial. See, e.g., Guile v. United States, 422 F.3d 221, 231 n. 14 (5th Cir.2005); Freund v. Nycomed Amersham, 347 F.3d 752, 765 (9th Cir.2003); Selph v. Farmer Bros., 56 Fed.Appx. 399, 399 (9th Cir.2003)(unpublished disposition). Coupled with the strong background presumption that parties must raise arguments on appeal to preserve them, the provisions of Rule 50 gave Jones more than adequate notice that he should preserve his arguments for a new trial and a remittitur by at least raising these motions on appeal even if he did not pursue them in the district court. Jones said nothing about these motions throughout the appellate process.
B. Relevant Precedents
Our review of the precedents also establishes that Jones has abandoned his motions. Although the Supreme Court has not considered the precise situation we now confront, its most relevant decision is consistent with our holding. Moreover, our holding is identical to that of four of the five circuits that have confronted a situation in which a party who has been granted judgment as a matter of law fails to obtain a conditional ruling on its motion for a new trial before the district court and fails to argue for a new trial on appeal.
In Neely v. Martin K. Eby Construction Co., 386 U.S. 317, 319-20, 87 S.Ct. 1072, 18 L.Ed.2d 75 (1967), the Supreme Court held that, where the plaintiff won a jury verdict, the district court denied defendant’s motions for judgment as a matter of law and for a new trial, and the plaintiff did not raise grounds for a new trial on appeal, the appellate court did not err in reversing the district court’s denial of judgment as a matter of law and ordering judgment for defendant. Neely supports the result we reach here because it held that an appellate court has the authority to order a district court to enter final judgment following a reversal of the district court’s ruling on judgment as a matter of law. Id. at 330, 87 S.Ct. 1072. Importantly, Neely also emphasizes that a party who has received a favorable ruling on a motion for judgment as a matter of law (which in Neely was the trial court’s denial of defendant’s motion for judgment as a matter of law) can and should raise grounds for a new trial on appeal to protect itself in the event that the ruling on the motion for judgment as a matter of law is reversed on appeal. The Court explained that “it should not be an undue burden [for appel-lee] to indicate in his brief why he is entitled to a new trial,” id. at 328, 87 S.Ct. 1072, and that “Rule 50(d) makes express *132 and adequate provision for the opportunity — which [appellee] had without this rule — to present his grounds for a new trial in the event his verdict is set aside by the court of appeals,” id.
Although Neely dealt with the application of Rule 50(d) to a plaintiff who loses his jury verdict on appeal (whereas here the jury verdict of the plaintiff is being reinstated), the dissent claims that Neely precludes the result we reach here. It bases this conclusion on Neely’s statement that “an appellate court may not order judgment ... where the record reveals a new trial issue which has not been resolved.” Id. at 325, 87 S.Ct. 1072.
The dissent’s reliance on this single statement is misguided because it wrests the quoted language from its context. Indeed, the complete statement of the Supreme Court is the following: “[A]n appellate court may not order judgment where the verdict loser has failed strictly to comply with the procedural requirements of Rule [50(b) ], or where the record reveals a new trial issue which has not been resolved.” Id. Immediately prior to this quote, the Court describes four of its previous cases relating to the appellate review of a district court’s ruling on a motion for judgment as a matter of law or a new trial. Id. at 324-25, 87 S.Ct. 1072. Three of these cases dealt with the requirement, later captured in Rule 50(b), that a party must move for judgment as a matter of law at specified times during proceedings before the trial court. Id. Those cases are irrelevant to the proceedings here.[31] In the fourth case, Weade v. Dichmann, Wright & Pugh, Inc., 337 U.S. 801, 804, 808-09, 69 S.Ct. 1326, 93 L.Ed. 1704 (1949), the plaintiff won a jury verdict, the trial court denied judgment as a matter of law, and the appellate court reversed and ordered judgment for the defendant. Finding “suggestions in the complaint and evidence of alleged liability” under an alternate theory, the Supreme Court ordered the decision modified so as to eliminate the direction to enter judgment, thereby giving the plaintiff who lost its jury verdict on appeal the opportunity to pursue a new trial. Id. at 809, 69 S.Ct. 1326.
In light of this context, Neely’s language instructing courts of appeals not to order judgment “where the record reveals a new trial issue which has not been resolved” is addressed to a situation where the plaintiff-appellee won a jury verdict and succeeded, before the district court, in resisting the motions of the defendant-appellant to deprive him of his verdict. As the Supreme Court makes clear in Neely, such a plaintiff-appellee, even prior to Rule 50(d), and now in light of the explicit terms of Rule 50(d), can raise on appeal an argument that he should get a new trial in the event that the appellate court decides that the trial court erred in denying the defendants-appellant’s motion for judgment as a matter of law. Although this Rule 50(d) plaintiff-appellee never filed a motion for a new trial before the trial court because of his success in winning a jury verdict, the opportunity of the plaintiff-appellee to raise arguments for a new trial on appeal is justified by the importance of “protecting] the rights of the party whose jury verdict has been set aside on appeal.” Id. at 325, 87 S.Ct. 1072. As the Court explains in Neely, “[a] plaintiff whose jury verdict is set aside by the trial court on defendant’s motion for judgment n.o.v. may ask the trial judge to grant a voluntary nonsuit to give plaintiff another *133 chance to fill a gap in his proof.” Id. at 328, 87 S.Ct. 1072. The Court then explains that a “plaintiff-appellee should have this same opportunity when his verdict is set aside on appeal.” Id. These statements demonstrate the Court’s concern for the party who has received a jury verdict in his favor and who, if possible, should have his case resolved by a jury. It is in this particular context that the Court in Neely instructs that an appellate court may not order a judgment “where the record reveals a new trial issue which has not been resolved.” Id. at 325, 87 S.Ct. 1072.
These special circumstances, however, are inapplicable to the situation we now consider under Rule 50(c)(1). Unlike the plaintiff in the Rule 50(d) situation, Jones as defendant filed a motion for a new trial in conjunction with his motion for judgment as a matter of law. Because Jones succeeded in his motion for judgment as a matter of law, the trial court took from Jennings the jury verdict that he had won. On appeal, with our decision that the trial court erred in taking Jennings’ jury verdict from him, we are reinstating the jury verdict. Hence the concern of the Supreme Court in Neely for a plaintiff who is deprived of his jury verdict is not present here. Moreover, the failure of a plaintiff in the Neely scenario to press before the appellate court a new trial motion which the plaintiff never even made in the trial court is more understandable than the failure of Jones to press before us a new trial motion which he did make in the trial court. Even in the Neely scenario, however, where the Court affirmed the decision of the court of appeals to order entry of judgment for the defendant-appellant instead of awarding a new trial to the plaintiff-appellee, the Court emphasized the plaintiff-appellee’s failure to raise any argument in favor of a new trial on appeal despite Rule 50(d)’s express provision of an opportunity to do so. See id. at 329-30, 87 S.Ct. 1072.
Subsequent to Neely, the Second, Fifth, Seventh, and Eleventh Circuits have held a motion for a new trial abandoned when the moving party fails to request that the district court rule conditionally on the motions and that party fails to raise the motions on appeal. We emphasize that Jones’ failure to raise any argument for a new trial or a remittitur on appeal distinguishes his situation from the cases that the dissent cites in support of its proposition, in which the parties raised their arguments on appeal. See Bisbal-Ramos v. City of Mayagüez, 467 F.3d 16, 26 (1st Cir.2006)(“[Plaintiff] contends that the district court erred in reducing the jury’s damages awards.”); Systemized of New England, Inc. v. SCM, Inc., 732 F.2d 1030, 1037 (1st Cir.1984)(“On appeal, defendant presses three grounds for a new trial that were included in its original motion to the district court.”).[32]
In Oberman v. Dun & Bradstreet, Inc., 507 F.2d 349, 353 (7th Cir.1974), the Seventh Circuit considered a case in which the trial court granted judgment as a matter of law but did not rule on an alternative motion for a new trial. The appellate panel noted that “the defendant acquiesced in the trial court’s actions, and here only urges that we affirm the grant of judgment n.o.v.” Id. The court held that “the motion for a new trial is abandoned if not pressed on the trial court after the grant of judgment n.o.v.,” id., and has since reiterated this holding in the qualified immu *134 nity context, see Henderson v. DeRobertis, 940 F.2d 1055, 1057 n. 1 (7th Cir.1991).[33]
The Eleventh Circuit, in Edwards v. Board of Regents of the University of Georgia, 2 F.3d 382, 384 n. 6 (11th Cir.1993), likewise held that, where the “[a]p-pellee failed to pursue its motion for a new trial with the district court after the grant of j.n.o.v. and failed to argue for a ruling on that motion on this appeal[,][w]e are not obliged to remand for such a ruling, and we deem that motion abandoned.” See also Christopher v. Florida, 449 F.3d 1360, 1365 n. 3 (11th Cir.2006)(“Where a Defendant fails to pursue his motion for a new trial with the district court after the court grants JMOL without making the alternative ruling required by Fed.R.Civ.P. 50(c)(1), and the Defendant fails to argue for a new trial ruling on appeal, this Court has treated the issue as abandoned.” (Emphasis in original.)).
The Fifth Circuit also followed this approach in Arenson v. Southern University Law Center, 43 F.3d 194, 196 (5th Cir.1995), a case which aptly demonstrates “the delay and waste of judicial resources that can occur if parties are allowed to resuscitate dormant motions for new trial after the appeals court has once considered a judgment.” There, after the plaintiff prevailed before a jury, the district court granted defendants’ motion for judgment as a matter of law but did not rule on their alternative motion for a new trial. Id. at 195. On appeal, the court reversed the judgment of the district court and reinstated the jury’s verdict. Id. Defendants then sought a ruling from the district court on their motion for a new trial. Id. at 196. The court granted the motion, and the defendants prevailed at the second trial. Id. On appeal for the second time, the Fifth Circuit held that the district court erred in granting defendants’ motion for a new trial, explaining that “when the defendants failed to seek a ruling from the district court on their motion for new trial and failed to mention the new trial motion on appeal, they had abandoned the motion.” Id. (citing Johnstone v. Am. Oil Co., 7 F.3d at 1217, 1224 (5th Cir.1993)). The court concluded that Rule 50 “effectively set up a ‘use-it-or-lose-it’ system,” requiring the party moving for a new trial to “obtain a ruling for the benefit of the appellate court in case the judgment as a matter of law is reversed, or otherwise lose the right to the new trial.” Id. at 198.[34]
The Second Circuit reached the same result in Grant v. Hazelett Strip-Casting Corp., 880 F.2d 1564, 1571 (2d Cir.1989), holding that it need not remand for decision on a motion for a new trial. The court held that “[ujnder the circumstances of the case, including the fact that [defendant] fails to raise any reason for a new trial on appeal, we see no reason to deprive [plaintiff] of the benefit of the jury’s *135 verdict.” Id. (internal citation omitted). While the court did not explicitly hold the new trial motion abandoned under such circumstances, it also made no attempt to decide on the merits whether a new trial was warranted. Consequently, its conclusion was the functional equivalent of deeming the motion abandoned.
Only one court has taken an opposite approach to these procedural circumstances. In Rhone Poulenc Rover Pharmaceuticals Inc. v. Newman Glass Works, 112 F.3d 695, 698-99 (3d Cir.1997), the Third Circuit held that “prudence militates in favor of a remand so that the district court may consider” the undecided motions because the appellate court was “left with no record and, indeed, no guidance from the parties’ briefs on appeal as to the merits of Defendant’s new trial motion.” However, the Third Circuit did not acknowledge, and consequently did not explain, its deviation from the previous cases of the Second, Fifth, Seventh, and Eleventh Circuits indicating that a motion for a new trial is abandoned under such procedural circumstances. We respectfully disagree with its unique perspective.
In support of its position, the dissent cites precedents from other circuits that are inapposite because, unlike Jones, the parties raised the new trial issue on appeal. In Freund v. Nycomed Amersham, 347 F.3d 752, 765 (9th Cir.2003), the Ninth Circuit “rejected] [plaintiffs] contention that [defendant] has waived its right to a new trial motion.” Critically, however, the court noted that the defendant “raised the issue at the first appropriate point in its appellate briefs.” Id. The Freund defendant’s articulation of grounds for a new trial on appeal contrasts starkly with Jones’ silence, and consequently Freund is inapplicable here. Similarly, decisions from the Fourth and Eighth Circuits do not reveal whether the appellants raised their motions for new trial on appeal, and we therefore do not know whether those courts faced the situation confronting us or the situation in Freund. See Nodak Oil Co. v. Mobil Oil Corp., 526 F.2d 798, 798 (8th Cir.1975); Mays v. Pioneer Lumber Corp., 502 F.2d 106, 109 (4th Cir.1974).
C. Other Considerations
We are mindful of the important considerations of judicial economy underlying Rule 50, which “was adopted for the purpose of speeding litigation and preventing unnecessary retrials.” Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 250, 61 S.Ct. 189, 85 L.Ed. 147 (1940). If Jones had done what he should have done in the district court and on appeal with respect to the motions for a new trial and a remitti-tur, we could have addressed these motions as part of this appeal, the precise scenario contemplated by Rule 50. Remanding to the district court now to consider the motions for a new trial and a remittitur would result in “exactly the type of piecemeal litigation that the framers of Rule 50(c)(1) sought to avoid,” and we cannot condone “the delay and waste of judicial resources” that would ensue from such a decision. Arenson, 43 F.3d at 196.
The dissent sees the matter differently. Despite the trial court’s failure to make a conditional ruling on Jones’ motion for a new trial, as required by Rule 50(c)(1), and despite Jones’ failures to obtain such a ruling from the trial court and to raise the new trial motion on appeal, also as contemplated by Rule 50(c)(1), and now after the exhaustive attention given by this panel to the trial court’s erroneous decision to undo the jury verdict won by Jennings, the dissent insists that Jones should be permitted to go back to the trial court, tell the trial court that the new trial motion is no longer moot, and get the new trial that the dissent says the trial court is likely to grant.
*136 There are multiple problems with this approach, beginning with the evident premise of the dissent that the question of whether or not there should now be a new trial is solely the business of the trial court and the court of appeals has no voice on the matter. That premise is directly contrary to Rule 50, which contemplates that an appellate court should deal with the district court’s disposition of a motion for judgment as a matter of law and a motion for a new trial at the same time. If Jones had raised the new trial issue on appeal as he should have, we could have considered the merits of the new trial issue in the context of this appeal, at the same time as we addressed the trial court’s ruling on the motion for judgment as a matter of law. In that circumstance, there would be no basis for the dissent’s assumption that Jones is virtually entitled to a new trial. We might have agreed that there should be a new trial. We might have concluded that there should not be a new trial. We might have remanded the new trial issue to the trial court with guidance. But whatever the disposition of that new trial issue on appeal, our engagement with that issue on the basis of a record already before us, far from usurping the trial court’s authority, would have been exactly the engagement contemplated by Rule 50.
Now, despite the mistakes of Jones, the dissent says that we should leave the new trial issue to the trial court and virtually assure Jones a new trial. By excluding the appeals court from considering the new trial motion, that approach places Jones in a more favorable position than he would be in if he had complied with Rule 50. Such an approach sanctions the very piecemeal litigation that Rule 50 is designed to avoid, creating the possibility of multiple appeals from repetitive trials which may or may not have been justified. Moreover, the only circuit court decision to address the scenario described by the dissent held that such an approach was error. In Arenson, after the Fifth Circuit reversed the district court’s grant of judgment as a matter of law for the defendant and reinstated the plaintiffs jury verdict, the defendant sought and received a favorable ruling from the district court on his previously undecided motion for a new trial. 43 F.3d at 195-96. After the defendant prevailed at the second trial, the plaintiff appealed the second judgment, and the Fifth Circuit held that the district court erred in granting a new trial. Id. at 195. As the Arenson court explained, the district court’s error resulted in “exactly the type of piecemeal litigation that the framers of Rule 50(c)(1) sought to avoid.” Id. at 196. Although the dissent sees no problem with such piecemeal litigation, we view it as contrary both to the purpose of Rule 50 and to Arenson’s explicit holding.
Basic considerations of fairness also weigh against remanding to allow the district court to rule on the undecided motions when Jones alone is responsible for his failure to raise the motions on appeal. As we have discussed, Rule 50 provides notice to a party who has received a favorable grant of judgment as a matter of law that the possibility of a different outcome on appeal justifies addressing the alternative motions for a new trial and a remitti-tur both in the district court and on appeal.[35] It would be manifestly unfair to *137 Jennings, who has already won a jury verdict and secured a favorable ruling on appeal reinstating that verdict, if we were to allow the possibility of another trial despite Jones’ failure to preserve his arguments for a new trial at any stage of the process.
Finally, the dissent protests that we have addressed the motions for a new trial and a remittitur sua sponte. However, if we had overlooked the new trial and remit-titur motions when we issued our decision (a real possibility given the failure of Jones to raise or even mention those motions on appeal), and Jones brought them to our attention for the first time in a petition for rehearing, we would undoubtedly hold, consistent with innumerable precedents, that he had missed his opportunity to request a remand so that the district court could rule on the motions. See, e.g., Johnson v. Mahoney, 424 F.3d 83, 96 (1st Cir.2005)(“ ‘[A] party may not raise new and additional matters for the first time in a petition for rehearing.’ ” (quoting United States v. Bongiorno, 110 F.3d 132, 133 (1st Cir.1997))).[36] Jones should not be able to gain an advantage from our recognition of an issue that he failed to raise.
All of these considerations persuade us that the four circuits that have deemed motions abandoned under these circumstances were correct. Consequently, we join these circuits in holding that, when a party fails to obtain a conditional ruling on his motions from the district court in compliance with Rule 50(c) and further fails to raise his motions for a new trial and a remittitur on appeal, he has abandoned his motions.
V.
We conclude that the district court erred in granting judgment as a matter of law to appellee Jones based on qualified immunity. Jones’ use of increased force after Jennings ceased resisting violated the Fourth Amendment, the law was clearly established, and a reasonable officer in Jones’ circumstances would have believed that his conduct was a violation. Finally, Jones failed to obtain a conditional ruling from the district court on his motions for a new trial and a remittitur and has failed to raise these motions on appeal; consequently, we find these motions abandoned. Accordingly, the judgment of the district court is vacated and the jury verdict is hereby reinstated. All costs shall be awarded to the appellant.

So ordered.

. This court addressed other issues arising out of this dispute in Narragansett Indian Tribe v. Rhode Island, 449 F.3d 16 (1st Cir.2006)(en banc), which provides further background on the events that precipitated the search of the smoke shop.

. There is some uncertainty as to the precise length of time that elapsed between the time that Hill got up and the time that Jennings yelled in pain. In his closing argument to the jury, Jennings' attorney described the interval as "twelve seconds at least,” while Jennings' appellate brief describes the interval as eighteen seconds, citing only to the videotape of the incident. Although the videotape was played for the jury several times at trial and the jury also viewed the videotape during its deliberations, no one actually testified to the length of time that elapsed. Jones’ appellate brief describes the time as "12-15 seconds” without citation. Consequently, we will describe the length of time as “several seconds.” Dictionaries typically define "several” as "being more than two but fewer than many in number or kind.” See Random House Dictionary of the English Language 1754 (2d ed.1987). While this definition is necessarily inexact, we can do no better with this record.

. This case originally was brought by Jennings, his mother Paulla Dove Jennings, and Keith Huertas, another employee of the *114 smoke shop. The plaintiffs alleged a wide array of claims against various defendants, including excessive force under the Fourth Amendment, violation of equal protection under the Fourteenth Amendment, negligent infliction of emotional distress, intentional infliction of emotional distress, false imprisonment, and assault and battery. Aside from Jennings' excessive force and battery claims against Jones, all the claims were resolved in defendants’ favor, either by the court on defendants' motions for judgment as a matter of law or by the jury in its verdict. No other plaintiffs or defendants are involved in this appeal.

. The government explains that it did not file a pretrial motion raising the qualified immunity issue because Jones and other officers were not named in their individual capacities until shortly before the deadline for filing motions.

. At this juncture, the court granted judgment as a matter of law on various other claims that have no bearing on this appeal.

. At this juncture, the court again granted judgment as a matter of law on various other claims that have no bearing on this appeal.

. As we shall explain, this ruling of mootness was incorrect. See infra Section IV.

. On appeal, Jennings does not contest the district court's grant of judgment as a matter of law with respect to his state law battery claim.

. Our conclusion that a reasonable jury could have found that Jones increased the force he used after Jennings had already ceased resisting is based on the principle that we must view the evidence in the light most favorable to the jury verdict. This conclusion does not depend on the substance of the opening statements and closing arguments. However, the opening statements and closing arguments emphasize that this principle is consistent with the way that the case was argued to the jury.

. To buttress this criticism, the dissent relies on an idiosyncratic and distinguishable case. In Iacurci v. Lummus Co., 387 U.S. 86, 86-87, 87 S.Ct. 1423, 18 L.Ed.2d 581 (1967), the jury was instructed that, if it found that a “hoist” was negligently designed, it should indicate which of five specified design aspects was found unsafe by answering "yes” or "no” to five questions on a special interrogatory form. The jury found negligent design, but answered only one question in the affirmative, leaving the other four blank. Id. at 87, 87 S.Ct. 1423. From this lack of response, the appellate court concluded that the jury would have answered the other four questions in the negative. Id. The Supreme Court stated that it did not "share the Court of-Appeals' confidence as to the meaning” of the jury verdict, explaining that "[pjerhaps the jury intended to resolve these questions in respondent's favor; but the jury might have been unable to agree on these issues, or it simply might not have passed upon them because it concluded that respondent had negligently designed the hoist in another respect.” Id. at 87-88, 87 S.Ct. 1423. In Iacurci, the jury's lack of response to a set of specific instructions made it impossible either to “take the facts in the light most favorable to the verdict,” Whitfield, 431 F.3d at 8, or to extract the jury’s "discernible resolution of disputed factual issues,” Iacobucci, 193 F.3d at 23. Such circumstances are not present here, where the jury issued a general verdict in favor of Jennings and we are bound, by numerous precedents, to take the facts in the light most favorable to that verdict.

. The jury found for defendants on five other claims, indicating that it carried out its responsibilities carefully. Any judgment beyond that is pure speculation.

. Appropriately, the jury was not asked to address the qualified immunity issue. Nevertheless, in delivering the general verdict on Jennings’ claim of excessive force under the Fourth Amendment, the jury essentially was addressing the first prong of the qualified immunity inquiry. Because we now address the question of qualified immunity after this jury verdict for the plaintiff, our task on the first prong of the qualified immunity analysis is to "inquire whether the evidence at trial, viewed in the light most favorable to the verdict, is legally sufficient to support the jury’s verdict that the plaintiff was deprived of a constitutional right.” Wilson, 421 F.3d at 54.

. During the government's direct examination of Delaney, Jennings' attorney objected to certain questions because Delaney had not been qualified as an expert. The record does not disclose why the government had not qualified Delaney as an expert, but the court sustained Jennings' objections on these grounds. However, on cross-examination Jennings’ attorney also attempted to ask Delaney questions that would ordinarily require expert qualifications. When the government objected, Jennings’ attorney indicated that he now wanted Delaney to be qualified as an expert. The court stated that if Jennings wanted to use Delaney as an expert, the government would also have the opportunity, on redirect, to ask the questions requiring expert qualifications to which Jennings had originally objected. The parties agreed to this arrangement, and the court subsequently allowed both parties to use Delaney as an expert.

. The dissent claims that we do a "disservice” to the district court by stating that the district court would have reached a different conclusion from the jury on the excessive force issue. However, the district court explicitly included in its qualified immunity analysis the conclusion that "Jennings failed to present any evidence that Jones' actions deviated from the standard of conduct that should have been expected from an objectively reasonable police officer under the circumstances.” This statement is equivalent to a holding that there was no excessive force.

. Jennings argues that the district court erred in requiring expert testimony to prove excessive force. However, the district court did not actually impose this requirement. Instead, it noted that the jury had to have "sufficient evidence of the applicable standard for measuring the lawfulness of Jones’ conduct.” We read this as a requirement that Jennings produce some evidence, whether in the form of expert testimony, lay testimony, or other evidence, from which the jury could evaluate the reasonableness of Jones’ conduct.

. We are not suggesting that Officer Delaney's expert testimony was or was not essential to the submission of the excessive force issue to the jury. We are simply explaining how that testimony might have been useful to the jury in this case.

. Since the court’s ruling was made in the context of summary judgment, it took the facts in the light most favorable to the plaintiff. 127 F.3d at 1417. The point seemingly made by the dissent about this case (that a jury might not ultimately find those facts) does not undermine the value of the case as indicative of clearly established law.

. The dissent misconstrues the Supreme Court’s precedents relating to qualified immunity when it states that "[t]he very fact-intensive nature of the test for excessive force itself requires particularized prior case law.” It is true that the "right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it is clearly established,” Wilson v. Layne, 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)(emphasis added), but this requirement does not imply that the relevant case law must be particularized to address the alleged violation. Rather, once the right allegedly violated has been defined, the court must examine whether “the unlawfulness of particular conduct will be apparent ex ante to reasonable public officials.” See Brady v. Dill, 187 F.3d 104 (1st Cir.1999)(citing Wilson, 526 U.S. at 613, 119 S.Ct. 1692).

. Rodriguez v. Farrell, 294 F.3d 1276, 1278-79 (11th Cir.2002); Jackson v. City of Bremerton, 268 F.3d 646, 650-53 (9th Cir.2001); Eherle v. City of Anaheim, 901 F.2d 814, 820 (9th Cir.1990).

. Huang v. Harris County, No. 00-20806, 2001 WL 822534 (5th Cir. June 22, 2001)(un-published disposition); Brownell v. Figel, 950 F.2d 1285, 1288, 1293 (7th Cir.1991).

. Indeed, the dissent’s insistence on "particularized prior cases with similar facts," see supra note 18, is inconsistent with its use of these cases, which, for the reasons already stated, differ significantly from the circumstances present here.

. See supra Section II for a description of the evidence on this point.

. The dissent argues that Jones’ use of force was justified because Jennings was not totally secured at the time his ankle was broken and the officers were having a difficult time getting the flex cuffs on Jennings. The more important point, however, is that Jennings had ceased resisting before Officer Hill got up and walked away, and, as shown on the video, several seconds elapsed between the time that Officer Hill left and the time that Jennings yelled in pain as his ankle was broken. Thus, any difficulty or delay that the officers experienced in handcuffing Jennings was not due to resistance on Jennings' part, and does not alter our conclusion that an objectively reasonable officer in Jones' circumstances would not have believed that it was lawful to increase force after Jennings ceased resisting and stated that the restraint was hurting his previously injured ankle. Relatedly, the dissent’s statement that “Hill got out of the way because other officers were having trouble cuffing Jennings” incorrectly suggests that Jennings was still resisting when Hill got up and walked away.

. In our discussion of prong one, we were careful to point out that we were not suggesting that Delaney’s testimony was or was not essential to the jury’s determination that the force used by Jones was excessive. We simply explained how that testimony could have been helpful to the jury in reaching its excessive force verdict. We make a similar point here. The Delaney testimony is certainly relevant to the prong three determination that was to be made by the court: whether a reasonable official would have believed that the force being used was excessive. However, we are not suggesting that this testimony was or was not essential to that legal determination.

. We emphasize that it is the combination of a party’s failure to obtain a conditional ruling before the district court and failure to mention, let alone brief, the new trial motion on appeal that warrants a finding of abandonment. Our discussion does not reach the consequences of failing to obtain a conditional ruling from the trial court but raising the new trial issue on appeal.

. Courts have held that an undecided motion for a new trial, while error, does not preclude appellate jurisdiction over the appeal. E.g., Kusens v. Pascal Co., 448 F.3d 349, 356-58 (6th Cir.2006); Vollrath Co. v. Sammi Corp., 9 F.3d 1455, 1458-59 (9th Cir.1993).

. The dissent incorrectly states that "[t]he majority's rule is refuted by the plain language of” Rule 50. In fact, Rule 50 is silent as to the consequences of a district court’s failure to rule conditionally on a motion for a new trial.

. Rule 50(c)(1) explains: "If the renewed motion for judgment as a matter of law is granted, the court shall also rule on the motion for a new trial.... If the motion for a new trial has been conditionally granted, the order thereon does not affect the finality of the judgment. In case the motion for a new trial has been conditionally granted and the judgment is reversed on appeal, the new trial shall proceed unless the appellate court has otherwise ordered.” By explicitly stating that the conditional ruling does not affect the finality of the judgment, Rule 50(c)(1) indicates that the appellate court may review the new trial motion, which would otherwise be unre-viewable because the judgment was not final. See Allied Chem. Corp. v. Daiflon, Inc., 449 U.S. 33, 34, 101 S.Ct. 188, 66 L.Ed.2d 193 (1980)(explaining that “[a]n order granting a new trial is interlocutory in nature and therefore not immediately appealable”). Thus, Rule 50(c)(1) indicates that the parties may brief, and the appellate court will consider, the new trial motion on appeal.

. As previously noted, Rule 50(c)(1) goes on to explain: "In case the motion for a new trial has been conditionally denied, the appel-lee on appeal may assert error in that denial; and if the judgment is reversed on appeal, subsequent proceedings shall be in accordance with the order of the appellate court.” Again, this provision clearly contemplates that the appellee will assert arguments for a new trial for the appellate court to consider.

. The dissent's argument that "a party may appeal only judgments adverse to him” is unavailing in light of the provisions of Rule 50. *131 We do not hold that Jones had to prosecute a cross-appeal, but rather that Rule 50 contemplates that an appellee such as Jones may preserve his motions for a new trial and a remittitur by raising them on appeal. In addition to Rule 50(c)(1), which authorizes an appellee to assert error in the conditional denial of a motion for a new trial, Rule 50(d) states that, "[i]f the motion for judgment as a matter of law is denied, the party who prevailed on that motion may, as appellee, assert grounds entitling the party to a new trial in the event the appellate court concludes that the trial court erred in denying the motion for judgment.” (Emphasis added.) The advisory committee notes reinforce this principle, stating that a party who has prevailed on a motion for judgment as a matter of law "may, as appellee, besides seeking to uphold that judgment, also urge on the appellate court that the trial court committed error in conditionally denying the new trial. The appellee may assert this error in his brief, without taking a cross-appeal.” Fed.R.Civ.P. 50(c) advisory committee's note (emphasis added).

. See Cone v. W. Va. Pulp & Paper Co., 330 U.S. 212, 67 S.Ct 752, 91 L.Ed. 849 (1947), Globe Liquor Co. v. San Roman, 332 U.S. 571, 68 S.Ct. 246, 92 L.Ed. 177 (1948); Johnson v. N.Y, N.H. & H.R. Co., 344 U.S. 48, 73 S.Ct. 125, 97 L.Ed. 77 (1952).

. The dissent also cites United States v. Moran, 312 F.3d 480, 496 (1st Cir.2002)(Boudin, C.J., concurring). That decision — distinguishable because it is a criminal case — does not reveal whether the parties raised arguments in favor of a new trial on appeal.

. The dissent’s citation to Isaksen v. Vermont Castings, Inc., 825 F.2d 1158 (7th Cir.1987) is inapposite. Isalcsen does not reveal whether the appellee attempted to obtain a conditional ruling from the district court on its new trial motion, nor does it reveal whether the appel-lee raised the motion on appeal.

. The dissent attempts to distinguish the precedents we have discussed from the Fifth, Seventh, and Eleventh Circuits on the ground that those courts noted that the district court had failed to rule on the alternative motion for a new trial, while the district court in this case ruled that the motion was moot. However, the district court’s "ruling” consisted, in its entirety, of the statement that "[Jones’] motion for judgment as a matter of law is granted and the remaining motions become moot.” The district court thus did not "rule” on the motions in the sense contemplated by Rule 50(c)(1), and, moreover, this "ruling” leaves unaddressed the critical failure of ap-pellee to raise this erroneous ruling on appeal.

. The dissent’s suggestion that Jennings, as appellant, has waived his right to object to consideration on appeal of the motion for a new trial is unfounded. If Jones, as appellee, had raised his arguments for a new trial and a remittitur in his appellate brief, as he should have pursuant to Rule 50(c)(1), Jennings could have responded to them in a reply brief, but “[i]t is the burden of the party seeking the benefit to raise the legal arguments justifying the benefit,” Arenson, 43 F.3d at 197. Jennings cannot be charged with a *137 waiver when it was never his obligation in the first instance to raise on appeal the mootness ruling of the trial court on Jones' motion for a new trial.

. As the dissent observes, the Supreme Court in Neely held that “the appellee can choose for his own convenience when to make his case for a new trial” and suggested that, "in suitable situations,” the appellee might do so on a petition for rehearing. The Court made this statement, however, in a Rule 50(d) situation, where the district court both denied defendant-appellant’s motions for judgment as a matter of law and for a new trial, and, consequently, the plaintiff-appellee had never filed a motion for a new trial before the district court. The Court's concern thus has no bearing on Jones' circumstances here.